**UNITED STATES of America**

v.

**John ARENA and Michelle Wentworth, Defendants.**

No. 95–CR–144.

United States District Court,
N.D. New York.

March 19, 1996.

Thomas J. Maroney, United States Attorney, Northern District of New York, Syracuse, New York, (John Duncan, Assistant U.S. Attorney, of counsel), for U.S.

Frank Policelli, Utica, New York, for Defendant Arena.

Carl F. Guy, Syracuse, New York, for Defendant Wentworth.

### MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

Before the court are the post-trial motions of two defendants convicted by jury of violating and conspiring to violate the Hobbs Act, 18 U.S.C. § 1951, by causing butyric acid attacks at two medical facilities providing abortion services. The government's theory at trial was that this conduct was extortive within the meaning of the Act, wrongfully inducing the victims to depart with their property (namely their right to conduct business) and was in interference with interstate commerce. Oral argument was heard in Syracuse, New York on January 24, 1996. The following constitutes the Memorandum–Decision and Order of the court.

### I. BACKGROUND

The proof at trial and the record to date are sufficient to establish the following facts. On April 14, 1994, Michelle Campbell, the daughter of defendant Michelle Wentworth, entered the Planned Parenthood Center of Syracuse, New York and released a quantity of butyric acid into the facility. Butyric acid is a noxious and malodorous chemical. Inhalation of its odors can induce nausea, vomiting, dizziness, and a burning sensation in the

eyes, throat, and respiratory system. Michelle Campbell executed a similar attack at the offices of Dr. Jack E. Yoffa on May 19, 1994. Both offices provide reproductive services, including abortions. Defendant Wentworth was convicted by jury in state court in Onondaga County for charges relating to this conduct, and defendant Arena pled guilty to related charges.

Defendant Arena paid Michelle Campbell the sum of $100 for the first attack on Planned Parenthood, and $135 for the second attack on Dr. Yoffa's office. He also supplied the butyric acid for each attack. Arena recruited Campbell with the help of her mother, defendant Wentworth. Both Arena and Wentworth are antiabortion advocates with prior arrests arising from their protest activities.

The attacks caused significant losses at the two facilities. Both were forced to evacuate and close. Seven people from Dr. Yoffa's office required emergency treatment at hospitals for exposure to acidic vapors. Former patients were intimidated away, revenues were lost during the closings, substantial cleanup costs were incurred, new and costly security measures have been necessitated, and employees quit out of fear. Dr. Yoffa suffered losses in excess of $20,000 and Planned Parenthood in excess of $35,000.

On December 22, 1995, after an eight day trial, the jury returned their verdict. Both defendants were found guilty of two counts of extortion and one count of conspiracy to commit extortion in violation of the Hobbs Act. The post-trial motions of the defendants are addressed below.

## II. DISCUSSION

The court discerns three arguments in the memoranda of the defendants. First, they contend the Hobbs Act is inapplicable to the facts of the case and the evidence at trial could not as a matter of law support the convictions. Wentworth Memorandum ("Mem.") of Law, Document ("Doc.") 74, at

7–14; Transcript of Motions, Exhibit ("Exh.") A attached to Wentworth Mem. of Law, Doc. 74.[1] Second, defendant Arena asserts that the incompetence of the counsel for the codefendant during trial prejudiced him to the extent that a new trial is required. Arena Notice of Motion, Doc. 72, at 2–3. And third, defendant Wentworth claims that the federal prosecution following her state conviction for the same conduct violated her constitutional rights. Wentworth Mem. of Law, Doc. 74, at 12. In addition to these points, briefed and argued by counsel, Mr. Arena in a statement to the court raised numerous complaints which the court will address at the end of this opinion.

After a general review of the standards for granting judgment of acquittal in a criminal case, or for a new trial, the particulars of each defendant's arguments will be examined.

### A. Standards

It matters not whether a motion for judgment of acquittal is made before the jury's verdict or after; the available grounds and standard for granting or denying are the same. *See United States v. Burns,* 597 F.2d 939, 941 (5th Cir.1979). The motion should be granted "if the evidence is insufficient to sustain a conviction" Fed.R.Crim.P. 29(a), or possibly if there is a "hopeless variance" between the proof and the crime charged, 2 Charles A. Wright, Federal Practice and Procedure: Criminal 2d § 466, at 654 (1982 & Supp.1995). The trial judge in considering a motion under Rule 29

> must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon

---

1. Defendant Arena in his Notice of Motion, Doc. 72, renews the Fed.R.Crim.P. 29(a) motions he made following the close of the government's case without reducing the substance of those motions to the text of his post-trial filings. A transcript of the Rule 29(a) motions of both defendants can be found appended to defendant Wentworth's Memorandum of Law, Doc. 74, as Exhibit A. The court reserved decision on these motions, and decides them here.

which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.

*Curley v. United States,* 81 U.S.App.D.C. 389, 160 F.2d 229, 232–33, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1512, 91 L.Ed. 1850 (1947); *accord United States v. Rodriguez,* 706 F.2d 31, 41 (2d Cir.1983); *United States v. Lieberman,* 637 F.2d 95, 104–05 (2d Cir.1980); *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir.1972); *United States v. Moustakis,* 864 F.Supp. 390, 391–92 (S.D.N.Y.1994).

■ ] The evidence should be evaluated in a light most favorable to the government, *United States v. Cunningham,* 723 F.2d 217, 230 (2d Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984), and the defendant's burden is very heavy, *United States v. Chang An–Lo,* 851 F.2d 547, 553 (2d Cir.) (citations omitted), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). A reserved decision on a motion for acquittal made during trial must be decided "on the basis of the evidence at the time the ruling was reserved." Fed.R.Crim.P. 29(b). That limitation is of no consequence in the matter sub judice as the reserved Rule 29(a) motions concern issues which would not be affected by the defense's case.

■ "Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29 . . ., that discretion should be exercised sparingly." *United States v. Sanchez,* 969 F.2d 1409 (2d Cir.1992), *cert. denied,* —— U.S. ——, 115 S.Ct. 1404, 131 L.Ed.2d 291 (1995). A district judge may order a new trial "if required in the interest of justice." Fed. R.Crim.P. 33. New trials may be granted on several grounds, including inter alia newly discovered evidence, juror bias, prosecutorial misconduct, ineffective assistance of counsel, witness perjury, or simply that the verdict was against the great weight of the evidence. *See generally* 8A James Wm. Moore, Moore's Federal Practice ¶ 33.02[1] n. 2, 33.04–.06 (2d ed. 1995). However, the court is usually

directed to defer to the jury's resolution of the weight of the evidence and witness credibility. *Sanchez,* 969 F.2d at 1414 (quoting *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)).

With these benchmarks in mind, the court proceeds to the argument over the applicability of the Hobbs Act to the facts of this case.

## B. The Hobbs Act

Both defendants argue that the government in this case failed to prove beyond a reasonable doubt all the elements of extortion under the Hobbs Act, which reads in pertinent part

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years or both.

18 U.S.C. § 1951(a).

"Extortion" in turn

means the unlawful taking or obtaining of personal property from another, with his consent, induced by wrongful use of actual or threatened force, or fear, or under color of official right.

*Id.* § 1951(b)(2).

By its own terms, the Hobbs Act is also violated when a defendant attempts to extort in interference with interstate commerce. *E.g., United States v. Rindone,* 631 F.2d 491, 493 (7th Cir.1980) (per curiam).

Between their two motions, defendants challenge the applicability of every element of the crime. For this reason, the separate elements of Hobbs Act extortion are analyzed in the order they appear in the statute, with individual arguments of the defendants interwoven. Additionally, defendant Wentworth makes an unparticularized argument that the Hobbs Act was not intended by Congress to apply to the circumstances of this case and is an unwarranted extension of

federal jurisdiction into the domain of the states. This 'federalism' contention is also discussed.

### 1. Interstate Commerce

█ Beginning with the required nexus with commerce, defendant Wentworth relies upon *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) for the proposition that the charged extortive conduct must 'substantially' affect interstate commerce. Wentworth Mem. of Law, Doc. 74, at 6. In the much discussed *Lopez* case the Supreme Court struck down the Gun–Free School Zones Act as an unconstitutional exercise of Congress' power to regulate interstate commerce. —— U.S. at ——, 115 S.Ct. at 1626. Prior to *Lopez,* all the circuits that considered the issue held that only a de minimis effect upon commerce need be shown for a Hobbs Act offense. *See United States v. Hathaway,* 534 F.2d 386, 396 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Daley,* 564 F.2d 645, 649 (2d Cir.1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978); *United States v. Traitz,* 871 F.2d 368, 390 (3d Cir.), *cert. denied,* 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989); *United States v. Billups,* 692 F.2d 320, 321 n. 7 (4th Cir.1982), *cert. denied,* 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 93 (1983); *United States v. Gerald,* 624 F.2d 1291, 1299 (5th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981); *United States v. Harding,* 563 F.2d 299, 302 (6th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); *United States v. Crowley,* 504 F.2d 992, 997 (7th Cir.1974); *United States v. Shackelford,* 494 F.2d 67, 75 (9th Cir.), *cert. denied,* 417 U.S. 934, 94 S.Ct. 2647, 41 L.Ed.2d 237 (1974); *United States v. Bolton,* 68 F.3d 396, 398 (10th Cir.1995); *United States v. Frost,* 61 F.3d 1518, 1524 (11th Cir.1995).

In a previous decision denying defendants' pretrial motions, this court held that *Lopez* does not invalidate this wealth of precedent. *United States v. Arena,* 894 F.Supp. 580, 584–85 (N.D.N.Y.1995).[2] Specifically, the court held that it was sufficient if the government pled and proved an effect upon interstate commerce by a "depletion of assets" theory.[3] *Id.* Since that decision, several circuit courts of appeals have considered the issue of whether *Lopez* affects existing law on the interstate commerce element of the Hobbs Act, and concluded that it does not. The Tenth Circuit for example, in comparing the Gun–Free School Zones and Hobbs Acts, observed that "[u]nlike possession of a firearm in a school zone ... robbery and extortion are activities that through repetition can substantially affect interstate commerce." *United States v. Bolton,* 68 F.3d 396, 399 (10th Cir.1995). The *Bolton* court specifically reaffirmed both the de minimis standard, *id.,* and the viability of the depletion of assets theory, *id.* at 398. See also *United States v. Farmer,* 73 F.3d 836, 843 (8th Cir.1996) and *United States v. Stillo,* 57 F.3d 553, 558 n. 2 (7th Cir.1995) for the same holding. This court agrees with *Bolton* that the "Hobbs Act regulates activities which in aggregate have a substantial effect on interstate commerce," 68 F.3d at 399, and therefore "the de minimis character of individual instances arising under [this] statute is of no consequence," *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (citations omitted).

█ Given these standards, the court finds that the evidence adduced at trial was sufficient for a rational trier of fact to conclude that interstate commerce was affected by the butyric acid attacks. There was testimony that Planned Parenthood and Dr. Yoffa's offices purchased medical supplies from out-of-state and that services were offered to out-of-state patients. Either of these connections can support Commerce Clause-based

---

2. Number 37 on the docket sheet.

3. Under this doctrine "commerce is affected when an enterprise, which either is actively engaged in interstate commerce or regularly purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing its potential as a purchaser of such goods." *Arena,* 894 F.Supp. at 584–85 (citing

*United States v. Collins,* 40 F.3d 95, 101 (5th Cir.1994) and *United States v. Morgano,* 39 F.3d 1358 (7th Cir.1994)); *see also United States v. Zeigler,* 19 F.3d 486, 490 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 517, 130 L.Ed.2d 422 (1994); *United States v. Elders,* 569 F.2d 1020, 1025 (7th Cir.1978).

jurisdiction for the specific conduct prosecuted under the Hobbs Act in this case. Support for this holding can be found in the legislative history of the Freedom of Access to Clinic Entrances ("FACE") Act wherein Congress studied the effect upon interstate commerce of violent and obstructive conduct directed towards reproductive health centers. *See, e.g.,* H.R.Conf.Rep. No. 488, 103d Cong., 2d Sess. 7 (1994), *reprinted in* 1994 U.S.C.C.A.N. pp. 699, 724, 724 (finding that violent protest conduct directed at reproductive health clinics interferes "with the interstate commercial activities of health care providers"); H.R.Rep. 306, 103d Cong., 2d Sess. 7–8 (1993), *reprinted in* 1994 U.S.C.C.A.N. 699, 704–05 (relating story of patient who traveled from Virginia to Kansas to obtain abortion for fetus with malformed heart).

The aggregate effect of violence directed at reproductive health facilities upon interstate commerce is actually increasing the interstate nature of abortion services. Because of the fear of violence, the number of doctors performing these services has declined, particularly for women in rural areas, leaving only 17% of U.S. counties with abortion providers. H.R.Rep. No. 306 at 8, 1994 U.S.C.C.A.N. at 705. This in turn has compelled the physicians who do perform abortions to travel periodically to underserved communities in neighboring states, as did the late Dr. David Gunn. *See* H.R.Rep. No. 306 at 7, 1994 U.S.C.C.A.N. at 704. For further support that obstructive and violent conduct targeting reproductive health clinics constitutes interference with interstate commerce to a degree sufficient enough to satisfy *Lopez,* see *United States v. Wilson,* 73 F.3d 675, 678–688 (7th Cir.1995) and *Cheffer v. Reno,* 55 F.3d 1517, 1520 (11th Cir.1995) wherein the post-*Lopez* constitutionality of the FACE Act was upheld.

Furthermore, it can hardly be doubted that the specific act of a butyric acid attack against a medical clinic is an activity which, through repetition, has a substantial effect on interstate commerce; Congress found as much in considering the FACE Act. *See* H.R.Rep. No. 306 at 9, 1994 U.S.C.C.A.N. at 706 (57 butyric acid attacks against clinics in 1992 with estimated cleanup costs of $500,-000). The court is of the opinion that these congressional findings respecting the effect upon commerce of antiabortion violence supports the conclusion that the government has proven a sufficient nexus with interstate commerce to invoke federal jurisdiction in this case.

Because a rational juror could have readily found that the defendants' conduct interfered with interstate commerce, the court will not disturb their verdict on this ground.

### 2. "Obtaining" of Property

█ Defendant Arena argues that the facts proven by the government do not constitute "obtaining" of property within the meaning of the Hobbs Act. Defendant posits that "[i]f he [the extorter] doesn't control the property, he doesn't exercise dominion over that property, he doesn't violate the statute." Transcript of Motions, Exh. A attached to Wentworth Mem. of Law, Doc. 74, at 6. Arena does not claim that the benefit must accrue to the extorter, *id.* at 8, 9, but that the benefit must at least be diverted to someone else by the extorter, *id.* at 10. Arena maintains that the "obtaining" must be done with a "larcenous intent." *Id.* at 7. This argument, that a defendant must have the specific intent to steal in order to be convicted of Hobbs Act extortion, is premised on the notion that terms in the Hobbs Act must be defined by reference to the New York extortion statute from which the federal law was derived. *Id.* at 6–7. Defendant Wentworth joins these arguments, arguing that the mere destruction or deprivation of property is not the obtaining of property. *Id.* at 25.

█ The court starts from the uncontested precept that the right to conduct a lawful business free from threats and violence is property within the meaning of the Hobbs Act. *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 101 (2d Cir.1990), *cert. denied sub nom. Syversen v. Summit Women's Ctr. West, Inc.,* —— U.S. ——, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); *United States v. Tropiano,* 418 F.2d 1069, 1077 (2d Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970). Like other terms in the Act, "obtaining" is given a broad definition. *West Hartford,* 915 F.2d at

101. For instance, an extorter need not receive the benefit of his conduct. *United States v. Green,* 350 U.S. 415, 420, 76 S.Ct. 522, 525, 100 L.Ed. 494 (1956); *United States v. Clemente,* 640 F.2d 1069, 1079–80 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981).

■ But defendants argue that the property must flow to someone; the intent must be larcenous, not merely mischievous. Transcript of Motions, Exh. A attached to Wentworth Mem. of Law, Doc. 74, at 6. Defendant Arena relies upon a number of cases for this mens rea requirement—not only in his post-trial motions, but in his pretrial motions and charge conference arguments. *See id.* at 6–7; Arena Mem. of Law in Support of Request to Charge, Doc. 85, at 4. The court has examined these authorities and found them fatally distinguishable. *United States v. Nedley,* for instance, stands for the proposition that robbery under the Hobbs Act requires the specific intent to steal. 255 F.2d 350, 357 (3d Cir.1958). The court has no quarrel with that contention, since the instant case involves extortion.[4] Similarly, *Evans v. United States* concerned extortion under color of official right, not extortion by force or fear. *Compare, e.g.,* 504 U.S. 255, 261, 112 S.Ct. 1881, 1885, 119 L.Ed.2d 57 (1992) ("Congress has unquestionably expanded the common-law definition of extortion to include acts by private individuals pursuant to which property is obtained by means of force, fear, or threats.") *with id.* at 263–64, 112 S.Ct. at 1886–87 ("Although the present statutory text is much broader than the common-law definition of extortion because it encompassed conduct by a private individual as well as conduct by a public official, the portion of the statute that refers to official misconduct continues to mirror the common-law definition.") (footnotes omitted). Arena's reliance on *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1972) is also misplaced, because that case was decided on the basis that the force or fear used was not "wrongful," *id.* at

399–400, 93 S.Ct. at 1009–10, not because the defendants lacked the intent to steal.

The only precedent which states the proposition that extortion by force or fear is a larceny-type offense is *United States v. Sweeney,* 262 F.2d 272, 275 & n. 3 (3d Cir. 1959). For support of that point, the Third Circuit cited *Nedley,* which has been distinguished, and in footnote 3, made reference to the New York state definition of extortion. The court concedes that prior to the adoption of the Hobbs Act the New York crime of extortion was a specific intent crime, *e.g., People v. Clark,* 242 N.Y. 313, 328, 151 N.E. 631, 636 (1926), and remains so today, N.Y.Penal Law § 155.05(1) & (2)(e) (McKinney 1988 & Supp.1996) (all forms of larceny require "intent to deprive another of property or to appropriate the same"). However, that concession does not compel the conclusion that Hobbs Act extortion requires specific intent. Indeed, the cases interpreting the federal crime of extortion are to the contrary.

This precise holding—that is, *Sweeney*'s conclusion that Hobbs Act extortion requires specific intent—was considered and rejected in *United States v. Bryson,* 418 F.Supp. 818, 826 (W.D.Okla.1975). Similarly, in *United States v. Furey,* the district judge observed that a proposed version of the Hobbs Act included the modifying phrase "knowingly or willfully." 491 F.Supp. 1048, 1059 (E.D.Pa.), *aff'd,* 636 F.2d 1211 (3d Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981). The judge reasoned that the omission in the final version "clearly indicates that the Hobbs Act was not intended to be a specific intent statute." *Id.* Other cases are in accord: *United States v. Warledo,* 557 F.2d 721, 729 n. 3 (10th Cir. 1977); *United States v. Green,* 246 F.2d 155, 159 (7th Cir.), *cert. denied,* 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957). This court agrees with these authorities and holds that extortion under the Hobbs Act does not require the specific intent to deprive or appropriate another's property, but is rather a general intent crime.

4. Although at least one appellate court has opined that *Nedley*'s holding that Hobbs Act robbery is a specific intent crime "may have

been wrongly decided." *United States v. Thomas,* 8 F.3d 1552, 1563 (11th Cir.1993).

Thus, even if defendants did not possess the specific intent to steal the property of the victims, they still could have "obtained" their property for purposes of the Hobbs Act. The government directs the court's attention to *United States v. Lewis,* a Seventh Circuit case that supports the contention that an extorter can "obtain" property without receiving or directing a tangible benefit. Footnote 3 of that opinion reads

> Most extortionists undoubtedly seek a direct and tangible benefit from their demands. Others do not, however, because they may be motivated only by a desire to humiliate the victim or a third party, and the discomfort they cause is the gain they derive from the scheme. Nonetheless, the Hobbs Act prohibits certain interferences with interstate commerce, and an extortion demand may have the proscribed deleterious effect on such commerce, even though the defendant never receives a transfer of property from the victim.

797 F.2d 358, 364 n. 3 (7th Cir.1986), *cert. denied,* 479 U.S. 1093, 107 S.Ct. 1308, 94 L.Ed.2d 162 (1987).

In this case, the jury had before it proof from which it could rationally conclude that the gain derived by Arena and Wentworth was the closing, even if temporary, of clinics offering medical services they considered abhorrent and immoral; and/or the publicity such conduct generated for their cause; and/or the potential for intimidating other physicians from performing abortions. Arena and Wentworth benefited not only from the psychic and moral assurance that there were, at least for a time, two fewer facilities where women could obtain abortions, but from the symbolic victory for their ideology. In accord is *Northeast Women's Ctr. v. McMonagle,* a civil RICO action against antiabortion activists wherein the predicate offenses were Hobbs Act violations. 868 F.2d 1342 (3d Cir.), *cert. denied,* 493 U.S. 901, 110

S.Ct. 261, 107 L.Ed.2d 210 (1989). The Third Circuit rejected defendant's challenge on appeal that an economic motive was required to sustain an extortion charge. *Id.* at 1349.[5] In this regard, this court points out that *McMonagle,* a 1989 Third Circuit case, appears to be at odds with that circuit's holding from thirty years earlier in *Sweeney* that extortion under the Hobbs Act requires a larcenous intent.

In obtaining the benefits described above, the defendants induced the victims to consensually depart with their right to conduct a lawful business free from violence and threats. *Cf. id.* Because the evidence was easily sufficient to prove beyond a reasonable doubt that defendants obtained the property of defendant with the requisite intent, a judgment of acquittal is improper, and a new trial would not further the interests of justice.

*3. Consent Induced By Force, Violence, or Fear*

■ Defendant Arena argues that in order for an extorter to induce the consensual relinquishment of property, the victim must know the extorter's identity. Transcript of Motions, Exh. A attached to Wentworth Mem. of Law, Doc. 74, at 10. Wentworth agrees, contending that there must be some precursory communication of a threat in order for the crime of extortion to be committed. Wentworth Mem. of Law, Doc. 74, at 7. This, the court believes, ignores the plain wording of the statute which provides that the consent of the victim can be induced by "*actual* or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2) (italics added).

Furthermore, the weight of authority contravenes defendants' assertions. For instance, the Second Circuit in *United States v. Billups* stated that "[t]he fear need not be the consequence of a direct or implicit threat by the defendant." 692 F.2d 320, 330 (2d Cir.1982) (citing *United States v. Duhon,* 565

---

**5.** The defendants in *McMonagle* also claimed that, even if the Hobbs Act normally does not require an economic motive, it is a necessary element when the Hobbs Act serves as the predicate of a RICO charge. 868 F.2d at 1350. The Third Circuit rejected that argument, *id.,* and the Supreme Court recently resolved the circuit split that had developed around this issue in the ap-

peal of another civil RICO action involving Hobbs Act predicates against antiabortion protesters. *National Org. for Women v. Scheidler,* —— U.S. ——, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). In that case, the Supreme Court held that no economic motive was required. *Id.* at ——, 114 S.Ct. at 806.

F.2d 345 (5th Cir.), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978)). Similarly, in *United States v. Capo* the Second Circuit held that "it is not necessary that the fear have been caused by the defendant" in order to sustain a Hobbs Act extortion conviction. 791 F.2d 1054, 1062 (2d Cir.1986), *rev'd on other grounds,* 817 F.2d 947 (2d Cir.1987) (en banc).[6] In support of this point, the *Capo* panel cited to *Duhon* and to *United States v. Margiotta,* 688 F.2d 108, 135 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). The reference to *Margiotta* is presumably because that opinion endorses a Hobbs Act extortion theory wherein the defendant exploits the fear of a victim, even though the victim's fear was not caused by any initiative of the defendant. *See id.*

The court is of the opinion that these precedents are equally applicable to a theory of extortion by actual use of force or violence. That is, it is not necessary that Planned Parenthood or Dr. Yoffa knew that defendants were responsible for the butyric acid attacks. What is required is that defendants did (or attempted to do) and conspired to obtain the property of the victims by inducing them, through the wrongful use of actual force or violence, to consensually give up their property. The conduct supporting the charges of Hobbs Act extortion in the *McMonagle* case included unlawful trespasses into clinics, assaults upon clinic employees, and vandalism—i.e., actual force and violence rather than threats. 868 F.2d 1342, 1345 (3d Cir.), *cert. denied,* 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989).

In the instant matter, the evidence proved beyond a reasonable doubt that the actual use of force or violence induced the victims to consensually relinquish their property to defendants. More specifically, the butyric acid

attacks induced Planned Parenthood and Dr. Yoffa to decide to temporarily close their businesses. The proof was sufficient for the jury to find that this closing, or perhaps the actual termination of these businesses, was the end sought by defendants.

### 4. *Federalism*

 Although the court has addressed all the defendants' particularized challenges to the applicability of the Hobbs Act, defendant Wentworth has raised a more general complaint that the crime of federal extortion was never meant to apply to what amounts to criminal mischief. Wentworth Mem. of Law, Doc. 74, at 14. For this suggestion, Wentworth relies on this language from the en banc rehearing in *United States v. Capo:*

It is the sensitive duty of federal courts to review carefully the enforcement of our federal criminal statutes to prevent their injection into unintended areas of state governance.... Exercising that duty, we find it necessary to nullify this attempted application of the Hobbs Act to circumstances it was never meant to reach. Incremental extensions of federal criminal jurisdiction arguably present a more pernicious hazard for our federal system than would a bold accretion to the body of federal crimes. At a minimum, a clear extension of federal responsibility is likely to be sufficiently visible to provoke inquiries and debate about the propriety and desirability of changing the state-federal balance. Less abrupt, more subtle expansions, however, such as nearly occurred here, are less likely to trigger public debate, and, yet, over time cumulatively may amount to substantial intrusions by federal officials into areas properly left to state enforcement. By holding that the Hobbs Act does not encompass state-law bribery, we seek to

**6.** The en banc reversal was authored by Judge Pratt, who dissented in the panel decision. Comparison of his dissent with his majority opinion in the en banc rehearing makes it clear the proposition cited above is good law in this circuit. The district judge in that case had instructed the jury that it was not "necessary that the Government prove that the fear of economic loss was the consequence of a direct threat made by the defendant. Nor is it necessary for the Government to prove that the defendant actually

created the fear in the minds of his victims, or was responsible for creating that fear." 791 F.2d at 1071. Judge Pratt did not take issue with this instruction in his dissent, but instead opined that it was "a proper distillation of the law of extortion by wrongful use of fear." *Id.* at 1072. And the en banc rehearing reiterated that "the panel majority and dissent agreed on the propriety of this instruction." 817 F.2d at 947. The reason for reversal was the insufficiency of the evidence of fear of economic loss. *Id.* at 952.

demarcate a point beyond which Congress intended federal prosecutors not to pass. 817 F.2d 947, 955 (2d Cir.1987) (citation omitted).

This court agrees with the sentiments expressed in this conclusory passage, but defendants misconstrue its meaning. The Second Circuit in the *Capo* rehearing did not refuse to apply the Hobbs Act to conduct which fit the parameters of the statute; they concluded that the conduct in that case did not violate the statute. *Capo* involved a job-selling scheme. The defendants secured employment at the Kodak plant in Rochester for people paying amounts ranging from $500 to $1000. *Id.* at 949–50. These facts supported a conviction of bribery or solicitation of bribery, not extortion. The job-seekers in *Capo* expected positive benefits if they paid the job-sellers; they did not fear loss of property they already held if they refused to pay. *See id.* at 954–55. It is evident that, regardless of what Congress' intent was, the Hobbs Act as printed in the United States Code did not proscribe the conduct proven in *Capo.*

Likewise, Justice Stewart in *United States v. Enmons* concluded his majority opinion with these expansive statements:

> [I]t would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes. Neither the language of the Hobbs Act nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States.

410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1972).

Despite the seeming broad sweep of these words, the Court in *Enmons* did not decline to apply the Hobbs Act to conduct which satisfied every element of the crime. To the contrary, it was held that any use of force or violence in that case was not "wrongful" within the meaning of the statute. *See id.* at 399–400, 93 S.Ct. at 1009–10. Defendants have unsurprisingly not found any precedents that would permit this court to overturn a Hobbs Act conviction upon the sole reason that it was obtained by a novel prosecution theory,[7] notwithstanding that the proven conduct fell clearly within the proscription of the statute.

The court therefore believes this case is more akin to *United States v. Brecht* wherein the Second Circuit reasoned that

> Since Congress has not limited the scope of extortion save for the statutory definition itself, we can formulate no judicial rule that would draw a practical line between one type of extortion that is covered by the Hobbs Act and another type which is not.

540 F.2d 45, 52 (2d Cir.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977).

The court of appeals in *Brecht,* although perhaps reluctantly, did not refuse to punish conduct squarely covered by the Hobbs Act merely because the circumstances of the case were novel, or out of speculation that Congress did not anticipate the law would be applied in such a fashion. This court similarly refuses to fashion ad hoc exemptions from

---

7. The court has located only one other reported case involving a Hobbs Act prosecution against violent antiabortion protestors: *United States v. Anderson,* 716 F.2d 446 (7th Cir.1983). Although actual force was used in that case, viz. kidnapping, the government's theory evidently was extortion by threats. *See id.* at 450.

Both *National Org. for Women v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) and *Northeast Women's Ctr. v. McMonagle,* 868 F.2d 1342 (3d Cir.), *cert. denied,* 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989) involved civil RICO suits with Hobbs Act predicates. Those Hobbs Act predicates were based on the extortionate activity of antiabortion activists by

means of the actual use of force and violence. 510 U.S. at ———–———, 114 S.Ct. at 801–02; 868 F.2d at 1345–46.

Two other civil RICO claims involving Hobbs Act predicates were decided in favor of antiabortion defendants. *Town of West Hartford v. Operation Rescue,* 915 F.2d 92 (2d Cir.1990), *cert. denied sub nom. Syversen v. Summit Women's Ctr. West, Inc.,* — U.S. —, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); *Town of Brookline v. Operation Rescue,* 762 F.Supp. 1521 (D.Mass.1991). But the holdings in those cases resulted from the axiom the Supreme Court discarded in *NOW v. Scheidler:* that an economic motive was required for RICO violations. *See supra* note 5.

the Hobbs Act for certain defendants whose conduct is otherwise prohibited.

The Second Circuit was willing, however, to admonish the United States Attorney to "exercise careful judgment" when deciding whether to commence a federal prosecution for a crime that treads so closely to a purely state offense. *See id.* n. 14. That admonition surely carries double-weight when the state has already successfully obtained convictions or guilty pleas for state crimes punishing the same conduct by the same defendants.

The rational finder of fact could have determined that every element of extortion by the actual use of force or violence was proven beyond a reasonable doubt in this matter. No post-trial relief is available upon this ground.

### C. Incompetence of Codefendant's Counsel

■ In an argument seldom encountered, defendant Arena claims the incompetence of the attorney for codefendant Wentworth prejudiced him to the extent that new, separate trials should be ordered. Arena Notice of Motion, Doc. 72, at 6 (Mem. of Law at 1). The errors Arena claims were committed by codefendant's counsel include: an opening statement without focus or theory; basic misunderstandings about the law; a rambling, incoherent, and inaudible speaking style; and cross-examinations of government witnesses that elicited testimony damaging to both defendants. *Id.* at 3. Arena points particularly to the cross-examination by his codefendant's counsel of Michelle Campbell for instances of the mistakes listed above. *Id.* Finally, Arena notes that in his closing argument, counsel for codefendant Wentworth "constantly referred to facts not in the record and was admonished by the Court for possible contemptuous conduct." *Id.* at 4. Overall, the collective errors of his codefendant's counsel are said to have "alienated the jury to the point where they could not fairly assess the evidence against Mr. Arena," *id.;* the incompetence of counsel for Wentworth had a "prejudicial spillover" which undermined his right to a fair trial, *see id.* at 7 (Arena Mem. of Law at 2).

Arena analogizes the claimed error to cases wherein the defenses of codefendants are antagonistic and to ineffective assistance of counsel cases. *Id.* at 6–8 (Arena Mem. of Law at 1–3). Neither Arena nor the United States has cited cases in which this specific issue has been considered, and the court has not discovered any helpful precedent. In one of the not uncommon coincidences of legal research, the issue was addressed in a post-conviction opinion on a motion to vacate sentence in *Tropiano v. United States,* 323 F.Supp. 964 (D.Conn.1971), the prior appellate opinion in which was cited in Part II.B.2 *supra,* and appears in the papers of both the government and defendants at various places. But although the district court in that case observed that "the Sixth Amendment has nothing to do with a defendant's preference for having a co-defendant represented by counsel acceptable to defendant," there was no allegation of incompetence as in the instant matter. *Id.* at 966.

Whether this court treats Arena's claim as analogous to a Sixth Amendment ineffective assistance of counsel argument, an antagonistic defenses argument, an argument that different evidence as to two codefendants has created a "prejudicial spillover," or as a more general claim of denial of due process, there must be evidence that Arena was prejudiced thereby. *See Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984) (for an ineffective assistance claim, must be reasonable probability that but for any unprofessional errors, trial verdict would have been different); *United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984) (substantial prejudice, in severance motion based on antagonistic defenses or prejudicial spillover, means that a miscarriage of justice has occurred); 8A James Wm. Moore, Moore's Federal Practice ¶ 33.01[4] & n. 3 (2d ed. 1995) (harmless error doctrine generally applicable to motions for new trial). There does not appear to be any probability that Arena was reasonably or substantially prejudiced by the conduct of counsel for codefendant Wentworth.

Arena points to the indelicate and fumbling cross-examination of government witness Michelle Campbell by codefendant's attorney as particularly damaging to both him and defendant Wentworth. Arena Notice of Motion, Doc. 72, at 3–4. "After the co-defendant's lawyer finished cross-examining Campbell the trial was over" for Arena, it is argued, meaning that the incompetent cross-examination doomed Arena's defense to failure. *See id.* Yet, it is hard to believe this is so. Campbell testified only as to facts that Arena did not challenge. Arena's strategy at trial never relied on contesting that the alleged conduct occurred. In his opening statement to the jury, counsel for Arena admitted that Arena, "[a]cting in concert with Michelle Campbell and Michelle Wentworth, ... intentionally damaged the property of Jack Yoffa ... and intentionally damaged the property of Planned Parenthood." Transcript of Opening Remarks, Exh. A attached to Government's Response to Defendant's Post–Trial Motions, Doc. 77, at 9. Arena's defense at trial was essentially identical to the post-trial motions addressed in Part II.B above: that the conduct did not constitute extortion under the Hobbs Act. Campbell's testimony was not particularly relevant to this line of defense, as noted by counsel for Arena in his opening statement:

> What light will she [Michelle Campbell] shed on whether or not any extortion was committed here? I submit to you none. I don't see the value of her testimony. Nobody disputes that it happened.

*Id.* at 11.

The cross-examination of Michelle Campbell by counsel for codefendant Wentworth did not elicit any testimony that could affect the genre of defense proffered by Arena. Therefore, even if the performance of counsel for Arena's codefendant was deficient, there is no reasonable probability "that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2067. Since by Arena's own admission Michelle Campbell's testimony was irrelevant to his defense, any incompetence in her cross-examination by Wentworth's counsel hardly could have prejudiced him.

■ Arena also contends that the cross-examination of Dr. Jack Yoffa and of Jeffrey Gilbert, the director of Planned Parenthood, by counsel for Wentworth was inept and elicited testimony highly prejudicial to both defendants. Arena Notice of Motion, Doc. 72, at 3. Specifically, Dr. Yoffa is said to have disclosed on cross that he "felt threatened as a result of the violent act to his property." *Id.* Certainly this testimony was relevant to the jury's determination of whether the victim's consent was induced by fear, force, or violence. Yet this was not the only evidence presented to the jury which tended to support the government's case in this respect: the direct examinations of Dr. Yoffa and Mr. Gilbert also revealed the fear caused by the attacks. In determining whether an attorney's handling of the cross-examination of a witness is deficient, the court may consider many factors, including:

> the importance of the witness' testimony in the prosecution's case, *whether the testimony was cumulative,* the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Mason v. Scully,* 16 F.3d 38, 44 (2d Cir.1994) (citations omitted) (italics added).

The damaging response during cross-examination was only cumulative over evidence adduced on direct. There was no reasonable probability of prejudice from this error, if it was such.

As another example of incompetence, Arena charges that the cross-examination of Jeffrey Gilbert revealed "that the defendants belonged to organizations that had reputations for violence." *Id.* Defendant Arena is apparently referring to pro-life organizations. But Michelle Campbell's testimony on direct revealed the defendants' active membership in these organizations also. Indeed, it is difficult to imagine how the jury in this case could not have heard or seen competent evidence expertly and deliberately elicited or proffered that indicated the defendants' membership in these groups. Counsel for Arena mentioned three pro-life advocacy

groups—Operation Rescue, the Lambs of Christ, and the Right to Life Federation—in his opening remarks. Transcript of Opening Remarks, Exh. A attached to Government's Response to Defendants' Post Trial Motions, Doc. 77, at 7. Additionally, both the government and counsel for defendant Arena reminded the jury several times that the propriety of abortion was not at issue in this case; whether the defendants committed extortion under the Hobbs Act was.

More generally, Arena appears to be complaining that the purported incompetence of counsel for Wentworth was so clownish that the jury was alienated against both defendants, depriving Arena from his constitutional right to a fair trial. Initially, the court notes that most of its admonitions to counsel for Wentworth were out of the presence of the jury, including the warning about the attorney's possibly contemptuous conduct during his summation. For the very few that were not, the court instructed the jury that the lawyers were not on trial. They were also charged that they should not show prejudice against an attorney or his client simply because the attorney has made objections. Finally, the jurors were warned not to draw any inferences against an attorney admonished by the court. The court believes these instructions were sufficient to mitigate any prejudice to Arena caused by the alleged negative opinion the jury formed of the attorney representing Michelle Wentworth. Furthermore, the contention that the jury would allow its poor opinion of Wentworth's lawyer to influence and overcome the decision they would otherwise reached in the case, i.e. to acquit Arena, would require this court to conclude that the jury acted in an arbitrary, whimsical, or capricious manner—an assumption that *Strickland* directs us to reject. 466 U.S. at 694–95, 104 S.Ct. at 2067–68.

The court is also of the opinion that many of the errors Arena complains of are the kind that might draw ridicule from other trial lawyers, but would most likely go unnoticed by a jury of laypersons. If counsel for Wentworth did misunderstand "basic cross-examination skills dealing with prior inconsistent statements; the admissibility of hearsay evidence; the laying of proper evidentiary foun-

dations; [and] refreshing recollections," Arena Notice of Motion, Doc. 72, at 4, another litigator might well deride counsel, but non-lawyers are unlikely to perceive this ignorance of the technical rules of evidence. That is why it is not merely the errors themselves that are the focus of inquiry, but what actual prejudice to the defense case was caused by the errors. *See Strickland*, 466 U.S. at 691–92, 104 S.Ct. at 2066–67.

Lastly on this issue, the court observes that prejudice is unlikely in this case because the evidence was overwhelming. *See United States v. Hurtado*, 47 F.3d 577, 584 (2d Cir. 1995). As has been said, Arena did not contest that the conduct happened, but only that the elements of extortion under the Hobbs Act were not met. In these circumstances the court finds it incredible that the jury would have accepted Arena's defense, but for the occasional tactical misstep by counsel for codefendant. Hence the court rejects this argument and denies the motion for a new trial upon this ground.

### D. Constitutionality of Subsequent Federal Prosecution

Defendant Wentworth makes two distinct arguments challenging the constitutionality of her prosecution in federal court for conduct she was already tried and convicted of in state court. First, Wentworth contends that the subsequent federal prosecutions were improper because they were initiated at the request of the Onondaga County District Attorney because he was dissatisfied with the sentence imposed by the state judge. Wentworth Mem. of Law, Doc. 74, at 12–13.

The second argument is that the subsequent prosecution violates the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution. Although Wentworth did not specifically broach this point at the post-trial motion hearing, the court addresses it here because the government did discuss it, because it seems intertwined with whatever inarticulate claim Wentworth is attempting to make in her first argument, and because the issue has arisen several times during these proceedings.

### 1. Conduct of the Onondaga County District Attorney

The court confesses that it does not understand whether Wentworth maintains that the District Attorney broke a promise made in exchange for John Arena's guilty plea, or simply that the District Attorney's motive in referring the case to the United States Attorney for possible federal prosecution was improper and violated one or more of Wentworth's constitutional rights. Both variants of this argument though are poorly developed and unpersuasive.

As for the first possibility, the court observes simply that Wentworth did not plead guilty as did John Arena: she proceeded to trial and was convicted. How could there have been any agreement for the state prosecutor to break? In response to questioning from the court in this regard, Wentworth answered that such an agreement may have induced Arena to plead guilty. To this explanation, the court has five objections. First, Wentworth has not produced any evidence of an express or implicit agreement that there would be no federal prosecution if Arena pled guilty to the state charges. Second, the state plea allocution for Arena reveals no promises:

THE COURT: I've made no representations about the federal government and what they're going to do in view of what I might do here in this courtroom.

Transcript of Plea, attached to Letter from AUSA John G. Duncan, Jan. 24, 1996. This disclaimer suggests that Arena was under no misconceptions that his plea would preclude subsequent prosecution in federal court. Third, a violation of a promise made to her codefendant in exchange for his plea would not violate any right of Wentworth, who chose to be tried, as this court observed at oral argument. Fourth, the District Attorney had no power to prevent the United States from commencing a prosecution against Wentworth in any event. And fifth, even if the promise was merely not to refer the case to the United States Attorney (not to actually prevent federal prosecution), a violation of that agreement might be remedied by the state court judge, but not by this court. In the absence of collusion between state and federal prosecutors amounting to a violation of the Double Jeopardy Clause, discussed below, this court cannot discipline the United States Attorney and his assistants and/or dismiss a federal indictment because a state prosecutor may have broken a plea promise.

A second possible characterization of this argument is that the District Attorney's motivation in referring this case to federal prosecutors—that is, his dissatisfaction with the perceived "light" sentence the state court judge imposed upon defendants—was improper and somehow deprived Wentworth of an undefined constitutional right. The argument is vague, rests on speculation, and is offered without supporting precedent. For instance, it presupposes that the U.S. Attorney would not have prosecuted this case without the recommendation of the District Attorney: this court is not at all convinced of that. Moreover, Wentworth has not explained why such a motivation, even if held, would be improper. Certainly there has been no explanation of how it would be so improper that the referral rose to the level of a constitutional violation. Nor has the court been apprised of which constitutional guarantee has allegedly been trodden upon.

With so little direction from defendant, the court declines to pursue this line of argument further and will proceed to the issue of double jeopardy.

### 2. Double Jeopardy

The dual sovereignty doctrine is an exception to the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (upholding state prosecution after federal prosecution); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (upholding federal following state). The Double Jeopardy Clause does not prevent two governments, e.g. the United States and New York, from prosecuting one defendant for the same conduct, "for the defendant has offended both sovereigns." *United States v. 38 Whalers Cove Drive,* 954 F.2d 29 (2d Cir.), *cert. denied sub nom. Levin v. United States,*

506 U.S. 815, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992).

There is an exception to the dual sovereign exception: dicta in the *Bartkus* case suggests that the Constitution is offended when the second sovereign is "merely a tool" of the first, or when the subsequent prosecution is "a sham and a cover" for the former prosecution. 359 U.S. at 123–24, 79 S.Ct. at 677–78. Although the exception is narrow, *United States v. Aboumoussallem,* 726 F.2d 906, 910 (2d Cir.1984), it remains an available argument for twice-prosecuted defendants, *United States v. All Assets of G.P.S. Automotive Corp.,* 66 F.3d 483, 494 n. 9 (2d Cir.1995).

 The evidence of collusion between state and federal prosecutors in this case falls far below the lofty threshold necessary to trigger the *Bartkus* exception. "[E]ven significant cooperation between state and federal authorities does not provide a basis for applying the Bartkus exception." *Id.* at 495 (citing inter alia *Whalers Cove,* 954 F.2d at 38). Several circuits have held that not even the cross-designation of a state district attorney to prosecute a federal crime, or vice-versa, suffices to overcome the dual sovereignty doctrine. *Id.* (citing cases from the 4th, 7th, 9th, and 11th circuits). It is alleged that the District Attorney referred this case to the U.S. Attorney. There is an additional unsupported allegation that the District Attorney took the unusual step of traveling to Washington "to convince officials there of the necessity for and the virtue of proceeding." Letter from Carl F. Guy, Esq., Jan. 29, 1996.[8] There is no indication that the District Attorney participated in the process of federal investigation, the drafting and presentment of the indictment to the grand jury, pretrial practice and preparation, or the actual conduct of the trial in this matter.

Nor is there any evidence that the state stands to gain a significant pecuniary benefit by this subsequent proceeding, a fact which convinced the Second Circuit in *All Assets* to remand the case to the district court for further fact-finding. 66 F.3d at 495–96. Dispositively, the evidence does not tend to show that the U.S. Attorney was a tool of the District Attorney, or that the federal prosecution was a sham or cover for another state prosecution: the *Bartkus* exception is inapplicable.

### E. Additional Arguments of John Arena

In defendant Arena's statement following oral argument upon these post-trial motions, the court heard three new arguments which it will dispatch here.

#### 1. Presentence Release

██ Defendant Arena first asked that he be released from detention. Since he has already been convicted, the court treats this request as a motion for presentence release pursuant to 18 U.S.C. § 3143(a). Magistrate Judge DiBianco originally concluded that defendant Arena was charged with a "crime of violence" and that he constituted a danger to the community that no conditions of release could reliably ameliorate and consequently ordered him detained pending trial. Order, Doc. 16. Undertaking a de novo review of that decision, this court concurred. *United States v. Arena,* 894 F.Supp. 580, 585–86 (N.D.N.Y.1995). The Second Circuit affirmed. Mandate/Order, Doc. 39. Thereafter, an application was made to Justice Ginsburg, who also refused relief. The court in considering defendant's motion for release will continue to classify the crime he has now been convicted of as one of violence. *See* 18 U.S.C. § 3156(a)(4).

8. Convincing Department of Justice officials in Washington of the wisdom of a subsequent federal prosecution is necessary under the *Petite* policy, now incorporated in the United States Attorneys' Manual. That policy was discussed in the only case the court has located dismissing a federal indictment following a state prosecution for the same conduct. *United States v. Belcher,* 762 F.Supp. 666, 673–74 (W.D.Va.1991). That policy was apparently followed in this case. Letter from Jo Ann Harris, Asst. Att'y Gen., Feb. 17, 1995. However, even if the Justice Department's internal procedure was not followed, it would confer no substantive rights upon defendants. *United States v. Howard,* 590 F.2d 564, 567–68 (4th Cir.), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1547, 59 L.Ed.2d 795 (1979); *United States v. Thompson,* 579 F.2d 1184, 1189 (10th Cir.) (en banc), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). Conversely, the fact the U.S. Attorney complied with the Justice Department's rules concerning successive prosecutions would not save an indictment that otherwise offended the Double Jeopardy Clause.

Because defendant was convicted of a crime of violence and there has not been any recommendation from the government that no term of imprisonment be imposed, defendant must prove that there is a substantial likelihood that a motion for acquittal or a new trial will be granted and, by clear and convincing evidence, that he is not likely to flee or pose a danger to other people or to the community. 18 U.S.C. § 3143(a)(2)(A)(i) & (B). Because the court is denying defendant's motions for acquittal or a new trial in this opinion, the first part of the analysis obviously cannot be satisfied. Nor has defendant presented any clear or convincing evidence that he will not constitute a continuing threat to medical clinics or other abortion providers if released, which dooms his application not only under section 3143(a)(2), but also under the alternative avenue for presentence release described in 18 U.S.C. § 3145(c). *See United States v. Crawford,* No. 95–CR–169, slip. op. at 4 (N.D.N.Y. Jan. 4, 1996) (Munson, Sr. J.) ("It is clear that under any method of obtaining presentence release the court must be persuaded by clear and convincing evidence that defendant will pose no threat to any person."). Defendant Arena's request for release pending sentence is thus denied.

## 2. Disqualification

██ In his statement defendant Arena renewed his pretrial request that I recuse myself from hearing his case because of an alleged bias. The pretrial motion was untimely within the meaning of 28 U.S.C. § 144 as it was filed less than a week before the first scheduled day of trial, even though the supporting factual allegations were long known to defendant. Notice of Motion, Doc. 60; Letter from John Arena, Dec. 3, 1995, Doc. 59; *see United States v. Sykes,* 7 F.3d 1331, 1339 (7th Cir.1993) (two month delay untimely). The court nevertheless considered the affidavit and, assuming the truth of the alleged facts, *id.,* found it legally insufficient to support the motion to disqualify.

██ The court interprets defendant's current complaint as a motion pursuant to Federal Rule of Criminal Procedure 25(b), for *post-verdict disqualification. The court is* guided in this instance not only by section 144, but by 28 U.S.C. § 455 which particularizes some of the situations that constitute personal bias or prejudice. The two provisions "are construed *in pari materia,* and the test of legal sufficiency of a motion for recusal is the same under both statutes." *United States v. IBM,* 857 F.Supp. 1089, 1091 (S.D.N.Y.1994); *cf. Liteky v. United States,* 510 U.S. 540, ——, 114 S.Ct. 1147, 1156, 127 L.Ed.2d 474 (1994) (extrajudicial source doctrine applicable to recusal under sections 144, 455(a), and 455(b)).

██ Defendant's first contention is that prejudice or bias arises because my wife has made charitable contributions to Planned Parenthood, a victim in this crime. It is clear that a charitable contribution does not constitute a financial interest in Planned Parenthood as defined by 28 U.S.C. § 455(d)(4) since the donation does not bestow any ownership interest, legal or equitable, in the entity. And revealingly, the statute explains that "[a]n office in an educational, religious, charitable, fraternal, or civic organization is not a 'financial interest'" in that organization. 28 U.S.C. § 455(d)(4)(ii). Thus, relationships with charities far more significant than that of a mere donor are excluded from the disqualifying circumstances in section 455(b). In addition, Planned Parenthood is not a party to this prosecution. In these circumstances, the court does not fathom how its impartiality might reasonably be questioned.

██ Secondly, defendant argues that this court's denial of pretrial release manifests prejudice towards him. That decision to detain defendant was made at his initial appearance by Judge Pooler. As has been said above in relation to defendant's motion for pretrial release, Magistrate Judge DiBianco held a hearing, then ordered defendant to remain detained pending trial. That order was reconsidered de novo by this court and affirmed, was affirmed by the Second Circuit Court of Appeals, and was denied review by a U.S. Supreme Court justice. Surely any extraordinary irregularity in that decision would have been ferreted out in this appeal process.

Also, defendant's argument would prove too much: if the mere fact of pretrial detention evidenced bias against a defendant, then the granting of bail might constitute a predisposition in his favor. Any pretrial ruling could conceivably be raised as a ground to disqualify a judge from presiding over the trial of any defendant affected by the ruling. This point is so settled, an author in 1969 was confident enough to state that

No case, either civil or criminal, has been found in which the courtroom acts or conduct of a federal district judge during trial, or *adverse rulings made by him*, either in the case or proceeding itself or *in related proceedings*, have been held to constitute a valid or adequate basis for disqualification....

Burr H. Glenn, Annotation, Disqualification of Federal Judge, Under 28 U.S.C. § 144, For Acts And Conduct Occurring In Courtroom During Trial Or In Ruling Upon Issues Or Questions Involved, 2 A.L.R.Fed. 917, 922 (1969 & Supp.1995) (italics added).[9]

The Second Circuit has said "what the judge has ... done in the proceedings before him[ ] is [not] any basis for disqualification; to be sufficient for disqualification the alleged bias or prejudice must be from an extrajudicial source." *King v. United States*, 576 F.2d 432, 437 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *accord In re IBM Corp.*, 618 F.2d 923, 929 (2d Cir.1980). The denial of pretrial release is clearly a decision in a related prior proceeding in this case; therefore, it is not a cognizable ground for disqualification. *See Liteky*, 510 U.S. at ——, 114 S.Ct. at 1157.

 As a third basis for disqualification, defendant Arena refers to a decision this court rendered some years ago when he, John Arena, and William Tapley, then officials of the Central New York State Right To Life Federation, sought relief against the Syracuse Saint Patrick's Day Parade Committee. The Committee refused to permit the Federation to enter its float and bus in the parade, and Arena and Tapley sued. The court denied their application for injunc-

tive relief. The court perceives no bias or prejudice that could result to defendant Arena in a jury trial of a Hobbs Act charge from this court's prior refusal to order the Saint Patrick's Day Parade Committee to admit a float sponsored by Central New York Right to Life.

The fact that defendant may have been a losing party to an equitable civil action before this court some years ago is not sufficient grounds for disqualification. · In *United States v. Ratcliff* the defendant argued that the district judge should have recused himself upon the reason that. the judge had presided over a prior civil action brought by the defendant. 806 F.2d 1253, 1255 (5th Cir.1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1625, 95 L.Ed.2d 199 (1987). The Fifth Circuit found no merit to this claim, observing that the alleged bias did not arise from an extrajudicial source. *Id.* The reported federal cases addressing this issue are in agreement. *United States v. Parrilla Bonilla*, 626 F.2d 177, 180 (1st Cir.1980) (issuance of injunction followed by conviction for trespass on military base); *Barry v. Sigler*, 373 F.2d 835, 836 (8th Cir.1967) (civil contempt in bankruptcy proceeding followed by habeas corpus petition from state custody); *Wilkes v. United States*, 80 F.2d 285, 289 (9th Cir. 1935); *United States v. Boffa*, 513 F.Supp. 505, 511 (D.Del.1981); *United States v. Partin*, 312 F.Supp. 1355, 1358 (E.D.La.1970).

In sum, this court concludes that a rational person, knowing all the facts, could not reasonably question the impartiality of this tribunal in this matter. *United States v. Pitera*, 5 F.3d 624, 627 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994).

### 3. Ineffective Assistance of Counsel

 Although defendant generally praised the performance of his advisory counsel, he lamented that the attorney avoided the issue of the propriety of abortion in arguing the case. The court addresses this as a claim of ineffective assistance of counsel.

9. Although by the time the 1995 supplement was published, at least two cases had been found. 2

A.L.R.Fed. at supp. §§ 2[a] & 3[a].

The omission described by defendant hardly seems to be a professional error: whether abortion is a legitimate medical practice or a moral perfidy is irrelevant to any element of extortion under the Hobbs Act. The only purpose of repeated references to the evils of abortion would be to appeal to the emotions of the jury, inviting nullification. Refusing to do so is consistent with ethical, professional practice.

Moreover, there is no reasonable probability that prejudice resulted to defendant Arena from his counsel's refusal to make abortion the issue. Such a tactic bears a considerable risk that the jury would be impassioned *against* the defendant. Even assuming that the jury's personal philosophies on abortion were as split as the American public's, to say that someone disfavors abortion is hardly the same as saying they approve of butyric acid attacks against medical facilities providing abortions. If the lawyer had followed the route defendant now says he would have preferred, it could very easily have done more harm than good.

Whether the decision was good or bad, counsel's conduct in this regard easily falls within "the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Avoiding the contentious abortion issue in defending his client from a Hobbs Act prosecution "was a strategic choice counsel was entitled to make." *United States v. Tarricone*, 21 F.3d 474, 476 (2d Cir.1993). Because the supposed failure was most likely sound judgment, and the strategy suggested by defendant might have in fact been detrimental to his case, the assistance of counsel was not ineffectual, and no relief is available upon this basis.

### III. CONCLUSION

Defendant Wentworth's motion for judgment of acquittal, or in the alternative, for a new trial is DENIED.

Defendant Arena's motion for judgment of acquittal, or in the alternative, for a new trial is also DENIED. Defendant Arena's motion for release from detention pending sentence is DENIED.

Sentencing for John Arena and Michelle Wentworth is scheduled for June 14, 1996, in Syracuse, New York. The United States Probation Office is directed to prepare presentence investigation reports pursuant to 18 U.S.C. § 3552(a) and Fed.R.Crim.P. 32(c).

It is So Ordered.