**UNITED STATES of America**

v.

**John ARENA and Michelle Wentworth, Defendants.**

No. 95–CR–144.

United States District Court,
N.D. New York.

July 25, 1995.

582

Thomas J. Maroney, United States Attorney, Northern District of New York, Syracuse, NY, for U.S.

Carl F. Guy, Syracuse, for defendant Wentworth.

Frank Policelli, Utica, NY, for defendant Arena.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

Both defendants in this case are charged with two counts of extortion and one count of conspiracy to commit extortion, all in violation of the Hobbs Act, 18 U.S.C. § 1951. The charges stem from two incidents in which defendant Wentworth's daughter, Michelle Campbell, allegedly released butyric acid into facilities in which abortions are performed. The first acid attack took place on April 14, 1994 at Planned Parenthood in Syracuse, New York. The second attack occurred on May 19, 1994 in the Syracuse office of Dr. Jack E. Yoffa. Presently before the court is a motion by defendant Wentworth to dismiss the indictment against her, and a motion by defendant Arena for reconsideration of Magistrate–Judge DiBianco's order detaining Arena pending trial. The court heard oral argument on the motions on July 14, 1995 in Auburn, New York.

## BACKGROUND

Defendant John Baptist Arena is an outspoken right-to-life advocate. He has a long criminal history relating to protesting abortion, with charges ranging from trespass to obstructing governmental administration. The government claims that Arena's protest behavior escalated steadily through April, 1994, when he allegedly recruited co-defendant Michelle Wentworth and her daughter, Michelle Campbell, to participate in the butyric acid attacks at issue in this case. According to the government, Arena supplied the acid and financed the criminal enterprise. He induced Wentworth and Campbell to participate by promising $100 for each clinic attacked.

The first target of the conspirators was Planned Parenthood in Syracuse. At noon on April 14, 1994 Michelle Campbell entered Planned Parenthood, gained access to the women's bathroom through a ruse, and discharged butyric acid throughout the bathroom. She poured some of the acid directly into the clinic's ventilation system.

Butyric acid is a colorless substance which emits an odor so noxious as to induce nausea and vomiting, dizziness, and burning of the eyes, throat, and respiratory system of those exposed to the vapors. Employees and patients of Planned Parenthood were overcome by the vapors released during the acid attack, and the clinic was forced to close for the day. A professional cleaning company was hired to clean the facility, and the clinic was not again fully operational until April 19, 1995.

The next target of the conspirators was the office of Dr. Jack Yoffa in East Syracuse. Campbell allegedly released butyric acid in Dr. Yoffa's office on May 19, 1995, using essentially the same scheme that was successful in her attack on Planned Parenthood. As in the previous attack, Campbell released the acid in the bathroom and left the office undetected.

The two deliberate attacks on medical facilities were costly. Planned Parenthood sustained losses approximating $35,500 relating to cleaning the facility and replacing damaged fixtures. The clinic also lost $5,500 in potential revenues during the time it was closed due to the attack. Planned Parenthood has endured further costs and aggravation due to security measures instituted as a result of the attack. Finally, two employees left their jobs at the clinic because they feared for their safety.

Dr. Yoffa's total financial loss relating to the attack on his offices was $20,430.53. That figure includes $9,295.00 to install bullet-resistant glass between the waiting room and the office suite. One employee quit in the wake of the attack, citing concern for his personal safety. Dr. Yoffa also lost several patients who no longer wish to be treated at his office.

Arena allegedly paid Campbell for the two attacks. He paid $100 for the attack on Planned Parenthood and $135 for the attack on Dr. Yoffa's office. The government alleges that Arena also offered Wentworth and Campbell $1,000 to fire-bomb an abortion clinic.

Michelle Wentworth was arrested on June 3, 1994. She was charged in a June 15, 1994 indictment in Onondaga County Court with criminal mischief, endangering public health, and conspiracy relating to the Planned Parenthood attack. In a separate indictment filed on July 26, 1994 she was charged with criminal mischief and endangering public health relating to the incident in Dr. Yoffa's offices. Wentworth pleaded not guilty to all charges, but was found guilty after a jury trial. She was sentenced on February 2, 1995 to five years probation and 500 hours of community service.

On April 20, 1995 a federal indictment was returned charging Wentworth and Arena with two counts of extortion and one count of conspiracy to commit extortion. These charges stem from the same events underlying the state charges against defendant Wentworth. On April 21, 1995 both defendants were arraigned before Judge Pooler. Defendant Wentworth was released on bail pending trial. Defendant Arena was detained pending a detention hearing.

The detention hearing took place on April 26, 1995 before Magistrate–Judge DiBianco. On May 2, 1995 the court issued a written decision detaining Arena pending trial because he was a danger to the community.

Presently before the court are motions by both defendants. Defendant Wentworth moves for dismissal of the indictment. Defendant Arena moves to overturn Magistrate–Judge DiBianco's decision to detain Arena pending trial. The court addresses each motion in turn.

## DISCUSSION

### I. Motion to Dismiss

In her scant submissions to the court in support of her motion to dismiss the indict-

ment against her,[1] defendant Wentworth raises four arguments. First, she argues that she cannot be convicted in federal court for the same offense that was the basis of her prior state court conviction. Second, she asserts that the Hobbs Act is both unconstitutional and inapplicable to defendant Wentworth's alleged misdeed. Third, she asserts that the grand jury which indicted her was not selected from a representative cross-section of United States citizens, in that women and mothers were excluded from the venire, and that she was improperly prevented from testifying before the grand jury. Fourth, Wentworth argues that the indictment was filed because of a personal grudge.

### a. Double Jeopardy

■ Wentworth's first argument is that she cannot be convicted of a federal crime for the same acts for which she was convicted in state court. This assertion clearly is erroneous. It is well established that the "double jeopardy clause's protection only applies in instances where the same sovereign is responsible for the successive prosecutions." *United States v. Giovanelli*, 945 F.2d 479, 491 (2d Cir.1991). It further has long been held that the federal government is a separate sovereignty from the individual states. *United States v. Lanza*, 260 U.S. 377, 378, 43 S.Ct. 141, 141, 67 L.Ed. 314 (1922). Under the principle of dual sovereignty "an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each." *Id.*, 260 U.S. at 382, 43 S.Ct. at 142. Because the United States has not previously prosecuted defendant Wentworth for the offense charged, her double jeopardy argument is meritless.

### b. Applicability of the Hobbs Act—Interstate Commerce

Wentworth next argues that the Hobbs Act is inapplicable to the acts for which she is charged. Her argument is based on her assertion that neither Planned Parenthood nor Dr. Yoffa's office has a nexus to inter-

state commerce. She cites the *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) in support of her contention that the commerce clause was never intended to cover purely local crimes.

Defendant Wentworth's reliance on *Lopez* is misplaced. In that case the Supreme Court held that the federal Gun–Free School Zone Act of 1990 ("the Act") exceeds Congress' commerce clause authority and therefore is unconstitutional. The Act made it illegal "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V). The Court noted that the Act neither regulated a commercial activity nor required that the possession of a gun be somehow connected to interstate commerce. *Lopez*, —— U.S. at ——, ——, 115 S.Ct. at 1626, 1634. Because "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce," the court ruled that Congress had no power under the Commerce Clause to regulate the activity. *Id.* at ——, 115 S.Ct. at 1634.

■ The Hobbs Act is distinguishable from the Gun–Free School Zone Act in that the former expressly requires a connection to commerce. The Hobbs Act applies only to one who "in any way or degree obstructs, delays, or affects commerce" through extortion. 18 U.S.C. § 1951(a). Further, in the instant case, the government pleads an affect on interstate commerce. The damages to Dr. Yoffa's office affects interstate commerce because he treats out-of-state patients. Additionally, both Planned Parenthood and Dr. Yoffa purchase goods in interstate commerce. Under a "depletion of assets theory," commerce is effected when an enterprise, which either is actively engaged in interstate commerce or regularly purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing its potential as a purchaser of such goods. *United States v. Collins*, 40 F.3d 95, 101 (5th Cir.

---

1. The Notice of Motion, Document ("Doc.") 17, is comprised of five terse paragraphs. The Notice is accompanied only by an attorney's affirmation, consisting of eleven one-sentence paragraphs. No memorandum of law was submitted in support of defendant Wentworth's motion.

1994); *United States v. Morgano*, 39 F.3d 1358 (7th Cir.1994). In short, the Hobbs Act is unaffected by the ruling in *Lopez*, and defendant Wentworth's arguments that the Hobbs Act is unconstitutional or inapplicable to the circumstances of this case are unpersuasive.

### c. Validity of the Grand Jury Proceedings

■ Wentworth's third argument for dismissal is that the grand jury proceedings were insufficient, both because the venire excludes women and mothers from service, and because she was not allowed to testify. A motion to dismiss an indictment based on an objection to the array of grand jurors is governed by Federal Rule of Criminal Procedure 6(b)(2), which incorporates by reference 28 U.S.C. § 1867. That section provides for a motion to dismiss based on a challenge to the array "within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor...." 28 U.S.C. § 1867(a). The moving party must submit "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title [regulating the selection of grand juries]." 28 U.S.C. § 1867(d). Thereafter the movant may "present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence." *Id.*

In this case defendant Wentworth's claim is inexplicable given that under the Plan for the U.S. District Court for the Northern District of New York jurors are randomly selected from voter registration and licensed drivers lists, both of which presumably include women and mothers. At oral argument counsel based his argument on surmise and speculation. He presented the court with absolutely no evidence tending to support the allegation that the grand jury venire is unrepresentative, and the motion to dismiss based on that argument is denied.

■ Defendant Wentworth further argues that she was improperly denied her right to testify before a grand jury. Yet while defendants have a right to testify in a criminal *trial*, no such right attaches to federal grand jury proceedings. The role of a grand jury is accusatory, rather than adjudicatory. As stated by Justice Scalia:

> It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge. That has always been so; and to make the assessment it has always been sufficient to hear only the prosecutor's side.... As a consequence, neither in this country nor in England has the suspect under investigation by the grand jury ever been thought to have a right to testify....

*United States v. Williams*, 504 U.S. 36, 51–52, 112 S.Ct. 1735, 1744, 118 L.Ed.2d 352 (1992).[2] Because defendant Wentworth had no right to appear before the grand jury, her motion to dismiss is also denied in so far as it is based on this argument.

### d. Impermissible Motive

■ Wentworth's final claim is that the indictment issued because the U.S. Attorney "collud[ed] with a local prosecutor whose nose is out of joint solely because he is dissatisfied with the sentence...." Guy Affirmation, Doc. 15, at ¶ 8. Assuming for the sake of argument that the defendant is correct, the motivation of a prosecuting attorney is irrelevant to the soundness of the indictment. The defendant's charge of an impermissible motive is merely an attempt to impugn the integrity of the indictment through an *ad hominem* attack. In so far as her motion to dismiss the indictment is based on this argument, the motion is denied.

In sum, defendant Wentworth's motion to dismiss the indictment is denied.

## II. Motion to Reconsider

■ Defendant Arena moves for reconsideration of Magistrate Judge DiBianco's decision to detain him pending trial. Where

---

**2.** Of course, nothing prevents a jurisdiction from creating a right to appear before a grand jury. Many states, including New York, have done so.

Under New York Criminal Procedure Law § 190.50(5) a defendant has a right to appear as a witness at a state court grand jury proceeding.

a defendant seeks review of a magistrate judge's detention order, a district court must fully reconsider the denial of bail. *United States v. Eaddy*, 853 F.Supp. 592, 593 (N.D.N.Y.1994). That is, the district court "should not simply defer to the judgment of the magistrate, but [must] reach its own independent conclusion." *United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985). In performing its *de novo* review, the district court may either rely on the record before the magistrate judge or, in its discretion, hold a new evidentiary hearing. *Id.; United States v. Hall*, 651 F.Supp. 13, 14 (N.D.N.Y. 1985).

In the instant case, the court finds that it is unnecessary to hold a new evidentiary hearing. At oral argument, defendant Arena noted that he did not request a rehearing, but seeks only a review based on the record before the Magistrate. The court therefore relies on that record.

■■■ Pursuant to 18 U.S.C. § 3142(g) factors to be considered on the issue of detention include: (a) the nature of the offense including whether it is a crime of violence; (b) the weight of evidence against the accused; and (c) the history and characteristics of the accused, including his character, physical condition and mental condition. Pretrial detention is appropriate only where a judicial officer determines that there are no conditions or combinations of conditions which will reasonably assure the appearance of the accused as required and the safety of the community. 18 U.S.C. §§ 3142(e), (f). Here, the government moves for detention based on a theory that defendant Arena is a threat to the community. As the moving party, the government bears the burden of proof. It must demonstrate the ultimate issue of dangerousness by clear and convincing evidence. *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir.1985).

a. Nature of the Offense

Arena argues that the Magistrate erred in classifying the charged offense as a crime of violence. *See* Order, Doc. 16 at 4–5, 12–14. The defendant's argument in this regard is threefold. First he asserts that the Magistrate failed to consider that the charged actions do not constitute a violation of the Hobbs Act. Second, he argues that the release of butyric acid in the reproductive health care facilities was not an act of violence because he did not intend to injure any person. Third, the defendant states that there is "[a]bsolutely *no* evidence" to support the "wild accusation" that he offered to pay $1,000 for the firebombing of a medical clinics. Affidavit in Support of Motion, attached to Notice of Motion, Doc. 25 at ¶ 6(c) (emphasis in original).

■■■ The defendant's first argument attacks the sufficiency of the evidence to support the indictment. In effect, Arena argues that the nature of the crime was not violent because his actions did not constitute a crime at all. Such an argument is futile given the well established precedent that a facially valid indictment may not be dismissed for inadequate or incompetent evidence. *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618–19, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956). An indictment is facially valid where, as here, it contains the elements of the offense charged and enables the defendant to adequately prepare a defense. *De Vonish v. Keane*, 19 F.3d 107, 108 (2d Cir.1994). An indictment that "tracks" the language of the statute and states time and place in approximate terms is generally sufficient. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *De Vonish*, 19 F.3d at 108–09. Because the indictment in this case meets these conditions, the court need not entertain an argument that no crime has taken place.

Nonetheless, the court has examined the relevant case law concerning the meaning of "extortion" under the Hobbs Act. The Hobbs Act expressly defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Defendant Arena argues that his actions were not legally extortionate because he obtained no property, and because the victims did not consent to any taking. He does not dispute that the alleged crimes were related to interstate commerce.

Courts have interpreted the language the Hobbs Act very broadly, holding that "property" includes "any valuable right considered as a source or element of wealth," including a right to solicit business, *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 101 (2d Cir.1990), *cert. denied*, —— U.S. ——, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992), and interpreting "obtaining" such that there "is no requirement that the perpetrator of an extortion receive the benefit of his act." *Id.; see United States v. Clemente*, 640 F.2d 1069, 1079–80 (2d Cir.) ("[W]hether a Hobbs Act defendant personally receives any benefit from his alleged extortion is largely irrelevant for the purposes of determining guilt under that Act."), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981); *Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342, 1350 (3d Cir.) (lack of economic motive is not a defense to a Hobbs Act violation), *cert. denied*, 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (5th Cir.1986) ("one need receive no personal benefit to be guilty of extortion; the gravamen of the offense is loss to the victim") (quotations omitted), *cert. denied*, 480 U.S. 949, 107 S.Ct. 1611, 94 L.Ed.2d 796 (1987). The Hobbs Act has frequently been applied to crimes undertaken for political reasons. *See, e.g., Libertad v. Welch*, 53 F.3d 428, 438 n. 6 (1st Cir.1995) ("it is difficult to conceive a set of facts that more clearly sets forth extortion" under that Hobbs Act than where abortion protestors physically obstructed entrance to health care facilities, using intimidation and harassment to prevent the clinics from conducting their normal, lawful activities); *United States v. Anderson*, 716 F.2d 446 (7th Cir.1983) (defendant kidnapped and threatened to kill physician unless he agreed to cease performing abortions). Given the expansive interpretations of Hobbs Act language by the courts, defendant's argument that the facts of this case do not constitute a Hobbs Act violation is misinformed, in addition to being premature.

Arena's second argument concerning the nature of the offense is also unconvincing, as his intent to commit harm to people is not a necessary element in the offense. As Magistrate DiBianco correctly noted, the Hobbs Act punishes the commission or the threat to commit physical violence to any person *or property* in furtherance of a plan to delay or obstruct interstate commerce. 18 U.S.C. § 1951(a). Arena admitted at the detention hearing that he intended to damage property, thereby forcing two healthcare providers to temporarily cease to operate their lawful businesses. *See* Transcript, Doc. 31, at 54 (Arena testifies on direct examination that "I admit that . . . I conspired to close down a killing center by putting [sic] butyric acid"). His intent to damage property is sufficient for purposes of the Hobbs Act, and is sufficient to constitute violence.

Defendant's third argument concerning the nature of the offense is that there is no evidence supporting the government's claim that he offered $1,000 to his co-defendant, Michelle Wentworth, to firebomb an abortion clinic. Magistrate Judge DiBianco concluded that this allegation was "in itself a strong reason for detention." Order, Doc. 16, at 12. Contrary to the defendant's contention, there is evidence in the record supporting the government's allegation. At the detention hearing the government introduced a statement written and signed by Michelle Campbell, an unindicted co-conspirator of Arena's. In her statement, Campbell stated that Michelle Wentworth told her that John Arena had offered Wentworth $1,000 to perform a firebombing. Government Exhibit ("Exh.") 2, at 12. Although this statement is double hearsay, pursuant to 18 U.S.C. § 3142(f), "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information" at a detention hearing. The court thus may consider Ms. Campbell's statement in assessing the nature of the crime charged.

Considering the totality of the circumstances, the court determines that defendant John Arena is charged with acts of violence, that defendant Arena's behavior appears to be escalating toward more violent activities, and that his intention in committing the crimes was to terrorize people into foregoing their rights under the law.

### b. The Weight of the Evidence

Defendant Arena argues that even if all of the government's allegations are presumed

588

true, it has not established a *prima facie* case that Arena violated the Hobbs Act. This claim is untenable, for reasons discussed above. Moreover, the evidence against the defendant is extremely strong, as he has confessed under oath to purchasing butyric acid and soliciting and paying for the attacks. Transcript, Doc. 31 at 72 (purchased the acid), 54 (participated in conspiracy), and 77 (paid for attack of Dr. Yoffa's office). Further, FBI Special Agent Patricia Peltier testified at the detention hearing regarding her interview of Michelle Campbell, who accused Arena with supplying her with butyric acid and paying for the attacks. Transcript, Doc. 31, at 17–18; Government Exh. 2, at 12. The government also introduced two checks drawn on Arena's bank account, presumably in payment for the attacks. Government Exhs. 3, 4.

c. Defendant's Personal Characteristics

Defendant Arena is seventy-four years old and has been hospitalized four times since his initial incarceration on federal charges. According to Arena, two of those hospitalizations resulted from chest pains which doctors concluded were related to stress. Arena was also hospitalized for internal bleeding related to stress.

The government notes that three of the four occasions on which Arena received medical attention followed his February 2, 1995 arrest on charges of aggravated harassment. Those charges are unrelated to the ones currently before the court. They resulted from allegations that Arena sent harassing mailings to Dr. Yoffa and to Salvatore Piemonte, an attorney representing Michelle Campbell. While incarcerated on the harassment charges, the defendant undertook a self-imposed forty day "spiritual fast." He lost thirty-eight pounds as a result of the fast, and three of his hospitalizations occurred during or directly after his hunger strike. Transcript, Doc. 31 at 61–64. Although the court will consider defendant Arena's ill health as a factor in the detention calculus, it must be mindful that much of the damage is self-inflicted.

d. Possible Release Conditions

Defendant Arena's attorney argues that "Arena's lengthy 'taste of jail' has given him more than sufficient incentive to abide by all court imposed conditions should he be released pending trial." Policelli Affidavit in Support of Motion, attached to Doc. 25, at ¶ 12. As the government notes, this claim is belied by Mr. Arena's extensive, seven year history of arrests relating to abortion protest activities. Moreover, Mr. Arena conceded at the detention hearing that he considered the possibility that the acid attacks might put innocent people in fear for their safety. Transcript, Doc. 31 at 74–75. Yet his unrepentant attitude toward his crime is characterized by his statement that "saving a human life is more important than somebody having to come back and go and getting (sic) a birth control pill a week later." *Id.* at 74. In short, Mr. Arena believes so fully in the righteousness of his cause that he is willing to sacrifice the legal rights of others to achieve his objective. This court believes that under these circumstances no conditions of release would suffice to ensure the safety of the community.

In particular, the court finds home confinement unsuitable in this case, as the defendant is capable of repeating his crime without leaving home. Nor would releasing defendant Arena into the custody of another member of the community ensure the security of those whose actions, although legal, offend the defendant. In general, the court finds that the actions defendant Arena has taken in furtherance of his cause have become increasingly violent, that there is evidence that his violent tendencies are escalating, and that the weight of evidence that he committed the crimes for which he is charged is compelling. Further, the court finds that defendant Arena's failing health is in part due to his own self-destructive behavior. Based on the totality of the evidence, the court finds that the government has met its burden, and no conditions of release will adequately ensure the safety of the community. This has been shown by clear and convincing evidence. Defendant Arena's motion therefore must be denied.

## CONCLUSION

In sum, defendant Wentworth's motion to dismiss the indictment is denied. Defendant Arena's motion for reconsideration of Magistrate Judge DiBianco's order of detention is also denied. Defendant Arena shall continue to be detained pending trial.

It is So Ordered.