**Jane DOE**

v.

**John DOE.**

**No. 3:95cv2722 (JBA).**

United States District Court, D. Connecticut.

June 19, 1996.

Deborah Chang, Rali Wakeman, Cummings & Lockwood, Stamford, CT, for Plaintiff.

Christine Sciarrino, Office of the U.S. Attorney, New Haven, CT, for USA/amicus curiae.

Julie Goldshein, Maureen Murphy, Sara Kay, NOW Legal Defense Fund, New York City, for NOW, Legal Aid Society, Nat'l. Coalition Against Domestic Violence/amicus curiae.

Diane Polan, Norman Pattis, Office of John R. Williams, New Haven, CT, for Defendant.

### RULING ON DEFENDANT'S MOTION TO DISMISS

ARTERTON, District Judge.

Plaintiff Jane Doe[1] seeks to avail herself of the civil rights remedy provided under the Violence Against Women Act of 1994 ("VAWA" or the "Act"), 42 U.S.C. § 13981, seeking damages for deprivation of her federal right to be free from her husband's alleged gender-based violence against her. Plaintiff alleges that from 1978 until 1995 the defendant "systematically and continuously inflicted a violent pattern of physical and mental abuse and cruelty upon the plaintiff," including throwing her to the floor, kicking her, throwing sharp and dangerous objects at her, threatening to kill her, and destroying property belonging to the plaintiff. Complaint ¶ 12. Plaintiff also alleges that the defendant forced her "to be a 'slave' and perform all manual labor, including maintaining and laying out his clothes for his numerous dates with his many girlfriends and mistresses." Complaint ¶ 27. She claims extreme emotional distress, including battered women's syndrome, post-traumatic stress disorder, and depression. Complaint ¶ 34.

Defendant's motion to dismiss the complaint challenges the constitutionality of the Civil Rights Remedy provision of the VAWA, claiming that Congress lacked authority under either the Commerce Clause or the Fourteenth Amendment of the United States Constitution to enact this statutory scheme recognizing and enforcing a federal civil right to be free from gender-based violence. The Government intervened pursuant to 28 U.S.C. § 2403(a), and argues in support of the constitutionality of the VAWA. In addition, because the Act's constitutionality has not been previously considered, a group of non-profit organizations representing and advocating on behalf of women who have survived gender-motivated violence was granted leave to appear as amicus curiae in light of their knowledge and expertise about the social problems the Act addresses.[2]

After full review of the VAWA statutory language, legislative history, and briefing of the parties, this Court rules that defendant's claims of unconstitutionality are unfounded. A rational basis exists for concluding that gender-based violence, which the VAWA's Civil Rights Remedy regulates, is a national problem with substantial impact on interstate commerce and thus is a proper exercise of congressional power under the Commerce Clause. The Court further concludes that the VAWA, modelled after other traditional civil rights legislation, is narrowly tailored and reasonably adopted to accomplish a constitutionally permitted end.

### I.  Discussion

#### A.  The Violence Against Women Act of 1994

In September 1994, Congress passed the Violence Against Women Act of 1994, a comprehensive statutory enactment designed to address "the escalating problem of violent crime against women," as part of the larger Violent Crime Control and Law Enforcement Act of 1994, P.L. 103–322.[3] S.Rep. 103–138,

---

1.  Plaintiff filed a Motion to Proceed Under Pseudonym, which was granted by the Court, on plaintiff's representation that the defendant had no objection. Subsequently, however, defendant's objection to this case proceeding under fictitious names has been clarified and he has moved to vacate the Court's order. Defendant's motion to vacate is under advisement.

2.  The members of the Amici are: NOW Legal Defense and Education Fund, National Organization for Women Foundation, The Connecticut Women's Education and Legal Fund, Inc., Connecticut Chapter of National Organization of Women, Connecticut Coalition Against Domestic Violence, Legal Aid Society of Hartford County, Inc., National Coalition Against Domestic Violence, and the Pennsylvania Coalition Against Domestic Violence.

3.  The Act also authorizes spending $1.6 billion over six years for grants to support state and local law enforcement and prosecution efforts to reduce violent crime against women (42 U.S.C.

103rd Cong., 1st Sess., *Violence Against Women Act of 1993*, 38 (Sept. 10, 1993). In considering whether a comprehensive federal approach was needed to address systematic, gender-based violent crime, Congress held numerous hearings over a four-year period and amassed substantial documentation on how gender-based violence impacts interstate commerce and interferes with women's ability to enjoy equal protection of the laws.[4] Congressional committees heard testimony from law enforcement officials, anti-domestic violence organizations, rape crisis centers, psychiatrists, other mental health experts, physicians, law professors, staff attorneys from legal advocacy groups, state Attorneys General, and victims of domestic violence. Congress also reviewed U.S. Justice Department statistics and studies of gender bias in state courts commissioned by seventeen state supreme courts. *See* S.Rep. 138, at 49 n. 52.

After such consideration, the congressional committees found:

1. "Violence is the leading cause of injury to women ages 15–44, more common than automobile accidents, muggings, and cancer deaths combined." S.Rep. 138, at 38.

2. "In 1991, at least 21,000 domestic crimes were reported to the police every week; at least 1.1 million reported assaults—including aggravated assaults, rapes, and murders—were committed against women in their homes that year; unreported domestic crimes have been estimated to be more than three times this total." *Id.* at 37.

3. "Every week, during 1991, more than 2,000 women were raped and more than 90 women were murdered—9 out of 10 by men." *Id.* at 38.

4. "An estimated 4 million American women are battered each year by their husbands or partners. Approximately 95% of all domestic violence victims are women. About 35% of women visiting hospital emergency rooms are due to injuries sustained as a result of domestic violence. One study of battered women found that 63 percent of the victims had been beaten while they were pregnant." H.R.Rep. 95, 103d Cong., 1st Sess., *Violence Against Women Act of 1993*, 26 (Nov. 20, 1993).

As part of the VAWA, Congress established a new federal civil right and remedy for victims of gender-based violent crimes. The Act declares that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981. As remedy for violation of this new civil right, the Act provides for compensatory and punitive damages awards and injunctive relief:

A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.

*Id.* at § 13981(c). The term "crime of violence motivated by gender" is defined as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." *Id.* at § 13981(d)(1). The statute does not require a prior criminal complaint, prosecution, or conviction to es-

§ 3796gg), education and prevention programs (42 U.S.C. § 300w–10), battered women's shelters (42 U.S.C. § 10409(a)), and community programs on domestic violence (42 U.S.C. § 10418). In addition, VAWA established new federal criminal penalties for "hate crimes" motivated by the victim's gender (28 U.S.C. § 994 note), new federal felonies for "interstate" domestic violence (18 U.S.C. § 2261, 2262), and proposed amendments to the Federal Rules of Evidence concerning the admissibility of the past sexual behavior of victims in criminal and civil sex offense cases (28 U.S.C. § 2074).

**4.** *See* S.Hrg. 897, 101st Cong., 2d Sess., *Domestic Violence: Terrorism in the Home*, 2 (April 19, 1990); S.Hrg. 939, Pt. 1, 101st Cong., 2d Sess., *Women and Violence*, 7 (June 20, 1990); S.Hrg. 101–939, Pt. 2, 101st Cong., *The Violence Against Women Act of 1990*, 51 (Oct. 19, 1990); S.Hrg. 369, *Hearing Before the Committee on the Judiciary*, 102d Cong., 1st Sess. (April 9, 1991); *Violence Against Women, Hearing Before the House Subcommittee on Crime and Criminal Justice*, 102d Cong., 2d Sess. (Feb. 6, 1992).

tablish the elements of the cause of action. *Id.* at § 13981(e)(2).

Congressional authority to enact the civil rights remedy was asserted as an exercise of the "affirmative power of Congress" under both the Fourteenth Amendment, section 5 and the Commerce Clause, section 8 of Article I of the U.S. Constitution. *Id.* at 13981(a). Defendant argues, however, that Congress exceeded its powers in enacting VAWA under both the Commerce Clause and the Fourteenth Amendment,[5] claiming that VAWA creates a "plenary federal police power," outside the Constitution's rubric which "creates a Federal Government of enumerated powers," *United States v. Lopez,* —— U.S. ——, ——, 115 S.Ct. 1624, 1626, 131 L.Ed.2d 626 (1995), and impermissibly encroaches on the states' separate and distinct powers under the Tenth Amendment. *See Id.* (citing *The Federalist No. 45,* pp. 292–293 (C. Rossiter ed. 1961)).

### B. The VAWA's Civil Rights Remedy and the Constitution's Commerce Clause.

■ Under the Commerce Clause, the Constitution grants to Congress three broad categories of activity which it has the power to regulate: (1) the use of channels of interstate commerce, (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, and (3) those activities that substantially affect interstate commerce. *Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1629–30 (citations omitted). The Court's analysis is limited to this third area of regulatory activity in light of the Supreme Court's attention to this prong in *Lopez* on which defendant relies.

■ In reviewing the constitutionality of a statute under the third prong of permissible regulation under the Commerce Clause, granting Congress power "[t]o regulate Commerce with foreign Nations, and among the several states," U.S. Const. art. 1, § 8, cl. 3, "[t]he task of a court that is asked to determine whether a particular exercise of congressional power under the Commerce

Clause is relatively narrow," *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981), and this Court's standard of review is limited to whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce. *Id.* While the Court's inquiry is an independent one, it will consider congressional findings, including congressional committee findings. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. If the court concludes that Congress had a rational basis for enacting the statutory provision at issue, then the remaining question is whether the means chosen by Congress are " 'reasonably adapted to the end permitted by the Constitution.' " *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360 (quoting *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)).

In *United States v. Lopez, supra,* on which defendant principally relies, the Supreme Court struck down, as violative of the Commerce Clause, the Gun–Free School Zones Act of 1990 (18 U.S.C. § 922(a)(1)(A),) which federalized the offense of possession of a firearm within 1,000 feet of a school. *Id.,* at ——, 115 S.Ct. at 1629. In *Lopez,* despite the absence of any Congressional findings for the Supreme Court to review, the Government claimed that the statute regulated an activity which substantially impacted interstate commerce because possession of firearms in a school zone may result in an increase in violent crime which would affect the national economy by increased insurance costs, reduction of the willingness of individuals to travel to areas within the country that are perceived to be unsafe, and by diminution in citizen productiveness from impaired student learning environments. *See Id.* at ——, at 1632.

The Supreme Court concluded, however, that the activity regulated by the Gun Free Zones Act did not fall within any of the three categories authorizing Congressional action under the Commerce Clause, and that gun possession was already subject to regulation

---

5. Because the constitutionality of the VAWA is found under the Commerce Clause, this opinion does not analyze the constitutionality of this statutory enactment under the Fourteenth Amendment as a remedy for past or prospective violations of equal protection.

by most states, which have " 'primary authority for defining and enforcing criminal law.' " *Lopez,* —— U.S. at —— n. 3, 115 S.Ct. at 1631 n. 3 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 634, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993)). Thus, the Court held that the "statute by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms," *Id.* at ——, 115 S.Ct. at 1631, and rejected the Government's "cost of crime" argument as an overexpansive theory which would permit Congress to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.* at ——, 115 S.Ct. at 1632.

■ Here, this defendant asserts that the Civil Rights Remedy of VAWA suffers the same constitutional defects as the Gun Free Zones Act. First, defendant maintains that *Lopez* overruled the rationality test for determining whether federal regulation of interstate conduct can be sustained. *See Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360. This Court disagrees. *Lopez* does warn that the Commerce Clause has limits, and that "the scope of the interstate commerce power 'must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote....'" *Lopez,* —— U.S. at ——, 115 S.Ct. at 1628 (quoting *N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)). Along with this warning, however, *Lopez* reaffirmed the rationality test of *Hodel:*

> Since that time, the Court has heeded that warning and undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce.

*Id.* —— U.S. at ——, 115 S.Ct. at 1629 (citing *Hodel,* 452 U.S. at 276–280, 101 S.Ct. at 2360–2362); *See Perez v. United States,* 402 U.S. 146, 155–56, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971); *Katzenbach v. McClung,*

379 U.S. 294, 299–301, 85 S.Ct. 377, 381–82, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc.,* 379 U.S. at 252–253, 85 S.Ct. at 354–55.

Defendant next seizes upon *dicta* in *Lopez* [6] as critical of the same arguments relied on in enacting VAWA, namely the Government's "cost of crime" and "national productivity" arguments, and deduces that similarly VAWA is an impermissible overreaching of congressional authority. Since this Court has concluded that *Lopez* did not overturn or limit the rationality test, and because Congress has demonstrated the need for this legislation, the Court rejects defendant's conclusion which is based upon "selectively relying on Supreme Court statements plucked from their context." *U.S. v. Wilson,* 73 F.3d 675, 685 (11th Cir.1995).

The Congressional findings and reports qualitatively and quantitatively demonstrate the substantial effect on interstate commerce of gender-based violence, in marked distinction to the Gun Free Zone Act challenged in *Lopez* which lacked such analysis, only theoretical impact arguments.

In its final report on the Violence Against Women Act, the Senate concluded:

> Gender-based crimes and fear of gender-based crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy. Gender-based violence bars its most likely targets—women—from full participation in the national economy. For example, studies report that almost 50 percent of rape victims lose their jobs or are forced to quit in the aftermath of the crime. Even the fear of gender-based violence affects the economy because it deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence.

S.Rep. 138, at 54.

Moreover, the House Conference found:

---

**6.** "Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard-pressed to posit any activity by an individual that Congress is without power to regulate." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632.

[C]rimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce; crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.

H.Report 103–711, *Violent Crime Control and Law Enforcement Act of 1994*, 103rd Cong., 2d Sess., 385 (Aug. 21, 1994) U.S.Code Cong. & Admin.News 1994 pp. 1801, 1839, 1853.

■ The determination of whether a particular activity substantially affects interstate commerce is "ultimately a judicial rather than a legislative question." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1629 (quoting *Heart of Atlanta*, 379 U.S. at 273, 85 S.Ct. at 366) (Black, J., concurring). "[S]imply because Congress may conclude that a particular activity affects interstate commerce does not necessarily make it so." *Id.* —— U.S. at —— n. 2, 115 S.Ct. at 1629 n. 2 (quoting *Hodel*, 452 U.S. at 311, 101 S.Ct. at 2391). However, because of the extensive compilation of data, testimony, and reports on which Congress based its findings, this Court is not left to speculate or " 'pile inference upon inference' to perceive an explicit connection between the regulated activity and interstate commerce." *United States v. Sage*, 906 F.Supp. 84, 92 (D.Conn.1995) (upholding the constitutionality of the Child Support Recovery Act under the Commerce Clause).

Defendant concedes that the gender-based violence that the VAWA was designed to discourage, affects interstate commerce, but asserts that the substantiality of its interstate impact is no more than that of other activities regulated under the states' police powers. While Supreme Court precedent does not articulate a particular standard or test to determine whether a particular activity "substantially affects" interstate commerce, *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) is instructive as

setting forth the outer-limit of Congress' authority to regulate private intra-state conduct. *See Lopez*, —— U.S. at ——, 115 S.Ct. at 1630.

In *Wickard*, a small Ohio farmer, Roscoe Filburn, harvested 23 acres of wheat, 12 acres more than his allotment under the Agricultural Adjustment Act of 1938. After harvesting his wheat, he sold a portion of his crop, fed part of it to livestock on his farm, used some as flour for home consumption, and kept the remainder for seeding future crops. The Secretary of Agriculture assessed him a penalty for his 12 acre excessive harvest under the Agricultural Adjustment Act, which was designed to regulate the volume of wheat moving in interstate commerce as a means of regulating surpluses and shortages to stabilize wheat prices. *Wickard*, 317 U.S. at 114, 63 S.Ct. at 83–84. The Supreme Court concluded that the repetitive impact of activity like farmer Filburn's home wheat consumption was sufficient to demonstrate substantial impact on interstate commerce to uphold the constitutionality of the Agricultural Adjustment Act:

> It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases. But if we assume that it is never marketed it supplies a need of the man who purchases in the open market. *Home-grown wheat in this sense competes with wheat in commerce.*

*Id.* at 128, 63 S.Ct. at 90 (emphasis added). *See Lopez*, —— U.S. at ——, 115 S.Ct. at 1630.

Certainly the repetitive nationwide impact of women withholding, withdrawing or limiting their participation in the workplace or marketplace in response to or as a result of gender-based violence or the threat thereof, is of such a nature to be as substantial an impact on interstate commerce as the effect of excess "home-grown" wheat harvesting which was found to have been properly regulated by Congressional enactment. *See Kat-*

*zenbach v. McClung*, 379 U.S. at 303, 85 S.Ct. at 383 (upholding Title II of the Civil Rights Act of 1964 and finding that the refusal of restaurants to serve African–Americans "imposed burdens both on the interstate flow of food and upon the movement of goods in general.").

After careful review of the Congressional history of VAWA, this Court concludes that the statistical, medical, and economic data before the Congress adequately demonstrated the rational basis for Congress' findings that gender-based violence has a substantial effect on interstate commerce. Notwithstanding *Lopez*'s conclusion that "states possess primary authority for defining and enforcing criminal law," *Lopez*, —— U.S. at —— n. 3, 115 S.Ct. at 1631 n. 3 (citations omitted),

dozens of courts throughout the country, post-*Lopez*, have upheld a variety of federal criminal and civil enactments as constitutional under the Commerce Clause, including those which proscribe interference with access to reproductive health clinics,[7] carjacking,[8] failure to pay child support,[9] possession of a firearm by a felon,[10] intrastate possession and/or sale of narcotics,[11] transfer and possession of machine guns,[12] extortion or robbery that affects interstate commerce,[13] Title III of the Americans with Disabilities Act,[14] the Employee Retirement Income Security Act,[15] the National Labor Relations Act,[16] and the Beef Promotion and Research Act of 1985.[17]

■ Defendant next argues that enactment of the VAWA encroaches on traditional

**7.** See, e.g., *United States v. Soderna*, 82 F.3d 1370 (7th Cir.1996); *U.S. v. Dinwiddie*, 76 F.3d 913 (8th Cir.1996); *U.S. v. Wilson, supra; Cheffer v. Reno*, 55 F.3d 1517 (11th Cir.1995); *American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995); *U.S. v. Scott*, 919 F.Supp. 76 (D.Conn.1996). *But see Hoffman v. Hunt*, 923 F.Supp. 791 (W.D.N.C.1996).

**8.** See, e.g., *U.S. v. Coleman*, 78 F.3d 154 (5th Cir.1996); *United States v. Hutchinson*, 75 F.3d 626 (11th Cir.1996); *U.S. v. Bishop*, 66 F.3d 569 (3rd Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995) and —— U.S. ——, 116 S.Ct. 750, 133 L.Ed.2d 698 (1996); *U.S. v. Robinson*, 62 F.3d 234 (8th Cir.1995); *U.S. v. Oliver*, 60 F.3d 547 (9th Cir.1995); *U.S. v. Williams*, 51 F.3d 1004 (11th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 258, 133 L.Ed.2d 182 (1995).

**9.** See, e.g., *U.S. v. Collins*, 921 F.Supp. 1028 (W.D.N.Y. April 16, 1996); *U.S. v. Kegel*, 916 F.Supp. 1233 (M.D.Fla.1996); *U.S. v. Sage, supra* (D.Conn.1995); *U.S. v. Hopper*, 899 F.Supp. 389 (S.D.Ind.1995); *U.S. v. Murphy*, 893 F.Supp. 614 (W.D.Va.1995); *U.S. v. Hampshire*, 892 F.Supp. 1327 (D.Kan.1995). *But see, U.S. v. Parker*, 911 F.Supp. 830 (E.D.Pa.1995); *U.S. v. Bailey*, 902 F.Supp. 727 (W.D.Tex.19995); *U.S. v. Mussari*, 894 F.Supp. 1360 (D.Ariz.1995), *reh'g denied*, 912 F.Supp. 1248 (D.Ariz.1995).

**10.** See, e.g., *U.S. v. Bennett*, 75 F.3d 40 (1st Cir. 1996); *U.S. v. Rambo*, 74 F.3d 948 (9th Cir. 1996); *U.S. v. Sorrentino*, 72 F.3d 294 (2d Cir. 1995); *U.S. v. Bell*, 70 F.3d 495 (7th Cir.1995); *U.S. v. Hinton*, 69 F.3d 534, 1995 WL 623876 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1026, 134 L.Ed.2d 104 (1996); *U.S. v. Bolton*, 68 F.3d 396 (10th Cir.1995); *U.S. v. Shelton*, 66 F.3d 991 (8th Cir.1995); *U.S. v. Rankin*, 64

F.3d 338 (8th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 577, 133 L.Ed.2d 500 (1995); *U.S. v. Collins*, 61 F.3d 1379 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995); *U.S. v. Mosby*, 60 F.3d 454 (8th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 938, 133 L.Ed.2d 864 (1996); *U.S. v. Hanna*, 55 F.3d 1456 (9th Cir.1995); *U.S. v. Cardoza*, 914 F.Supp. 683 (D.Mass.1996); *U.S. v. Taylor*, 897 F.Supp. 1500 (D.Conn.1995).

**11.** See, e.g., *U.S. v. Genao*, 79 F.3d 1333 (2d Cir.1996); *U.S. v. Leshuk*, 65 F.3d 1105 (4th Cir.1995); *U.S. v. Smith*, 920 F.Supp. 245 (D.Me. 1996); *U.S. v. Walker*, 910 F.Supp. 837 (N.D.N.Y. 1995); *U.S. v. Kremetis*, 903 F.Supp. 250 (D.N.H. 1995); *U.S. v. Salmiento*, 898 F.Supp. 45 (D.P.R. 1995); *U.S. v. Gonzalez*, 893 F.Supp. 935 (S.D.Cal.1995); *U.S. v. Garcia–Salazar*, 891 F.Supp. 568 (D.Kan.1995).

**12.** See *U.S. v. Wilks*, 58 F.3d 1518 (10th Cir. 1995).

**13.** See, e.g., *U.S. v. Bolton, supra; U.S. v. Stillo*, 57 F.3d 553 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995); *U.S. v. Arena*, 894 F.Supp. 580 (N.D.N.Y.1995).

**14.** See *Abbott v. Bragdon, supra.*

**15.** *Cannon v. Group Health Service of Oklahoma, Inc.*, 77 F.3d 1270 (10th Cir.1996)

**16.** *Aroostook County Regional Ophthalmology Center v. National Labor Relations Board*, 81 F.3d 209 (D.C.Cir.1996).

**17.** *Goetz v. Glickman*, 920 F.Supp. 1173 (D.Kan. 1996).

police powers of the state and impermissibly "federalizes" criminal, family law, and state tort law. The Civil Remedy section of VAWA, however, does nothing to infringe on a state's authority to arrest and prosecute an alleged batterer on applicable criminal charges. VAWA does not encroach on traditional areas of state law; it complements them by recognizing a societal interest in ensuring that persons have a civil right to be free from gender-based violence, and through the Civil Rights Remedy, makes operative the Act's remedial and deterrent purposes, by making violators of this right personally answerable to the victims in compensatory and punitive damages. Defendant's assertion that the Act "federalizes" family law is clearly contradicted by the VAWA's express language under which federal jurisdiction *excludes* "... any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree." 42 U.S.C. § 13981(e)(4).

■ Moreover, nothing in VAWA precludes a victim of domestic violence from bringing a tort action in state court for assault and battery or intentional infliction of emotional distress. The significance of this Act is its recognition of a federal civil right, with attendant remedies, which is distinct in remedy and purpose from state tort claims. A plaintiff who obtains relief in a civil rights lawsuit "does so not for himself [or herself] alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance." *City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986) (citations omitted). The distinct societal function Congress sought to confer by enacting the VAWA civil remedy was to provide by a plaintiff's verdict "a special societal judgment that crimes motivated by gender bias are unacceptable because they violate the victims' civil rights." S.Rep. 138, at 50. Given the distinctive function of the VAWA civil remedy, there is no impermissible encroachment or federalization of states' traditional police powers.

## C. Scope Of The Statutory Scheme Chosen by Congress is Reasonably Adapted to its Intended End.

■ Having concluded that there is a rational basis for Congress to find that gender-motivated violence substantially affects interstate commerce, the remaining issue before the Court is whether the particular statutory scheme chosen by Congress is reasonably adapted to its intended end. *Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360. In enacting VAWA, based in part on the results of states' reports of their self-assessments of deficiencies in their judicial systems in prosecuting injurious gender-based conduct, the House of Representatives found that both existing state and federal criminal laws were inadequate to protect against gender-motivated violence:

State and Federal criminal laws do not adequately protect against the bias element of crimes of violence motivated by gender, which separates these crimes from acts of random violence, nor do these [laws] adequately provide victims of gender-motivated crimes the opportunity to vindicate their interests; existing bias and discrimination in the criminal justice system often deprives victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled.

H.R.Rep. 711, at 385. Further, the Senate found:

Traditional State law sources of protection have proved to be difficult avenues of redress for some of the most serious crimes against women. Study after study has concluded that crimes disproportionately affecting women are often treated less seriously than comparable crimes affecting men.

S.Rep. 138, at 49.

The United States Supreme Court has recognized that these bias-inspired types of crimes are "thought to inflict greater individual and societal harm ... [because they] are more likely to provoke retaliatory crimes, inflict distinct emotional harms on their victims, and incite community unrest." *Wisconsin v. Mitchell*, 508 U.S. 476, 487–88, 113

S.Ct. 2194, 2200–01, 124 L.Ed.2d 436 (1993).[18] Given the important nature of the conduct sought to be prevented and the previously-approved private attorney general method of remedy, this court concludes that the statutory scheme which creates a federal civil rights remedy for gender-motivated violence is reasonably adapted to an end permitted by the Constitution. This conclusion is consistent with prior precedent related to other federal civil rights remedies enacted by Congress and upheld by courts as constitutional under the Commerce Clause. *See, e.g., Katzenbach, supra; Heart of Atlanta Motel, supra* (upholding Title II of the Civil Rights Act of 1964 under the Commerce Clause); *EEOC v. Wyoming,* 460 U.S. 226, 243, 103 S.Ct. 1054, 1064, 75 L.Ed.2d 18 (1983) (upholding the Age Discrimination in Employment Act under the Commerce Clause); *Pulcinella v. Ridley Township,* 822 F.Supp. 204, 211 (E.D.Pa.1993) (Fair Housing Act); *Abbott v. Bragdon,* 912 F.Supp. 580, 593–595 (D.Me. 1995) (Americans with Disabilities Act).

## II. Conclusion

Based on the above analysis, it is the Court's conclusion that enactment of the civil rights section of the Violence Against Women Act of 1994 was a permissible constitutional exercise of Congressional authority under the Commerce Clause, and reasonably adapted to its goal of deterring gender-based violence. Having reached this result, it is unnecessary to consider whether the Fourteenth Amendment also authorizes Congress to enact VAWA. For the above reasons, the Court DENIES defendant's motion to dismiss.

IT IS SO ORDERED.

---

18. "As Blackstone said long ago, 'it is but reasonable that among crimes of different natures those should be most severely punished, which are the most destructive of the public safety and happiness.'" *Id.* at 488, 113 S.Ct. at 2201 (quoting 4 W. Blackstone, Commentaries 16).